# United States Court of Appeals
## for the
# Seventh Circuit

Case No. 25-2587

IN RE: ABBOTT LABORATORIES, ET AL.
PRETERM INFANT NUTRITION PRODUCTS LIABILITY LITIGATION

ERICKA MAR, as administratrix of the ESTATE OF RAILEE MAR,

*Plaintiff-Appellant,*

– v. –

ABBOTT LABORATORIES,

*Defendant-Appellee.*

ON APPEAL FROM AN ORDER ENTERED IN THE NORTHERN DISTRICT OF
ILLINOIS, EASTERN DIVISION IN CASE NOS. 1:22-CV-00232 AND 1:22-CV-00071

## BRIEF FOR PLAINTIFF-APPELLANT

JOSE ROJAS
LEVIN, ROJAS CAMASSAR & RECK
40 Russ Street
Hartford, Connecticut 06106
(860) 535-4040
jose@lrcr.law

*Counsel for Plaintiff-Appellant*

COUNSEL PRESS    (800) 4-APPEAL • (624900)

Save As    Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 25-2587

Short Caption: Mar v. Abbott Laboratories

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

   [ ]  **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
 Ericka Mar, as Administratrix of the Estate of RaiLee Mar

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
 Levin, Rojas, Camassar, and Reck, LLC; Kaveny & Kroll, LLC; Johnson Becker, PLLC;

 Levin, Papantonio, Proctor, Buchanan, O'Brien, Barr & Mougey, P.A.; Lieff Cabraser Heimann & Bernstein, LLP

(3)    If the party, amicus or intervenor is a corporation:

    i)        Identify all its parent corporations, if any; and

          N/A

    ii)       list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

          N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

       N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

       N/A

Attorney's Signature: /s/ Jose M. Rojas          Date: September 23, 2025

Attorney's Printed Name:  Jose M. Rojas

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** [✔]  **No** [ ]

Address:  391 Norwich-Westerly Road, North Stonington, CT 06359

Phone Number: 860-535-4040          Fax Number:  860-535-3434

E-Mail Address: jose@LRCR.Law

rev. 12/19 AK

i

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................. ii

JURISDICTIONAL STATEMENT .................................................................................... 1

STATEMENT OF THE ISSUES ......................................................................................... 2

STATEMENT OF THE CASE AND FACTS .................................................................... 3

    I.     Factual Background ......................................................................................... 3

    II.    Procedural Background .................................................................................. 7

SUMMARY OF ARGUMENT .......................................................................................... 9

ARGUMENT ....................................................................................................................... 10

    I.     STANDARD OF REVIEW ........................................................................... 10

    II.    THE DISTRICT COURT MISAPPLIED THE SUMMARY-
             JUDGMENT STANDARD AND RESOLVED FACTUAL
             INFERENCES AGAINST THE PLAINTIFF ........................................... 10

          A.    Failure-to-Warn Causation is a Question for the Jury ...................... 10

          B.    The District Court Demanded Direct Proof of a
                Counterfactual That Can Only Be Inferred and Also
                Improperly Weighed the Strength of Evidence and
                Competing Inferences ............................................................................ 16

    III.   THE DISTRICT COURT ABUSED ITS DISCRETION IN
             DENYING RECONSIDERATION UNDER RULE 59(e) ...................... 18

          A.    Rule 59(e) Permits Relief for New Evidence or to Prevent
                Manifest Injustice .................................................................................. 18

          B.    Refusal to Reconsider Resulted in Manifest Injustice ...................... 24

          C.    Policy Considerations ............................................................................ 24

D.    Remand Is Required ........................................................................................ 25

CONCLUSION .................................................................................................................... 26

## TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Abdullahi v. City of Madison,*
  423 F.3d 763 (7th Cir. 2005) ..................................................................................10

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986) ..........................................................................................10, 11

*Bordelon v. Chicago Sch. Reform Bd. of Trs.,*
  233 F.3d 524 (7th Cir. 2000) ..................................................................................23

*Cloutier v. GoJet Airlines, LLC,*
  996 F.3d 426 (7th Cir. 2021) ...............................................................11, 12, 13, 16

*Emerick v. Wood River—Hartford School District No. 15,*
  No. 16-cv-0788-MJR-RJD, 2018 U.S. Dist. LEXIS 249911 (S.D. Ill.
  Mar. 19, 2018) ........................................................................................................18

*Groh v. Ramirez,*
  540 U.S. 551 (2004) ................................................................................................11

*Johnson v. Rimmer,*
  936 F.3d 695 (7th Cir. 2019) ..................................................................................10

*Knowlton v. Deseret Medical, Inc.,*
  930 F.2d 116 (1st Cir. 1991) ...................................................................................15

*McDonnell v. Cournia,*
  990 F.2d 963 (7th Cir. 1993) ..................................................................................17

*Payne v. Novartis Pharmaceuticals Corp.,*
  767 F.3d 526 (6th Cir. 2014) ..................................................................................14

*Payne v. Pauley,*
  337 F.3d 767 (7th Cir. 2003) ............................................................................16, 17

**Statutes & Other Authorities:**

18 U.S.C. § 1965(a) ....................................................................................................1

28 U.S.C. § 1291 .........................................................................................................1

28 U.S.C. § 1332 .........................................................................................................1

28 U.S.C. § 1332(c)(2) ...............................................................................................1

28 U.S.C. § 1391(a).....................................................................................................1

28 U.S.C. § 1391(b).....................................................................................................1

28 U.S.C. § 1407 .........................................................................................................1

Fed. R. App. P. 4(a)(1)(A)..........................................................................................1

Federal Rule of Civil Procedure 59.............................................................................1

Federal Rule of Civil Procedure 59(e) ................................................................. *passim*

Local Rule 56.1(a)(2) ..........................................................................................3, 4, 24

**JURISDICTIONAL STATEMENT**

The district court had jurisdiction over this civil action under 28 U.S.C. §§ 1332, 1391(a)–(b), 1407 and 18 U.S.C. § 1965(a). Jurisdiction of the district court is based on diversity. The underlying action is a wrongful death action and the amount in controversy exceeds $75,000. Ericka Mar is the duly appointed Administratrix of the Estate of RaiLee Mar and a citizen of West Virginia pursuant to 28 U.S.C. 1332(c)(2). Defendant/Appellee Abbott Laboratories is incorporated and has its principal place of business in Illinois.

The U.S. Court of Appeals for the Seventh Circuit has jurisdiction over this appeal under 28 U.S.C. § 1291. Plaintiff/Appellant seeks review of a final judgment entered by the district court on May 2, 2025 (Docket Nos. 96 & 97). That order granted summary judgment on all of Plaintiff/Appellant's claims, thereby denying all relief sought by Plaintiff/Appellant. Plaintiff/Appellant subsequently filed a Motion for Reconsideration under Federal Rule of Civil Procedure 59 on May 16, 2025 (Docket No. 100), which was denied by the District Court on August 11, 2025 (Docket No. 105). Plaintiff timely filed the Notice of Appeal pursuant to Fed. R. App. P. 4(a)(1)(A) on September 8, 2025.

## STATEMENT OF THE ISSUES

Whether the district court erred in granting summary judgment on Plaintiff's failure-to-warn claim by resolving factual inferences that should have been left to the jury.

**STATEMENT OF THE CASE AND FACTS**

**I.    Factual Background**

This appeal arises from the death of RaiLee Mar, a premature infant fed Abbott's Similac Special Care formula. Within hours of first consuming Defendant's premature infant formula, RaiLee developed necrotizing enterocolitis and did not survive. RaiLee's mom, Plaintiff, Ericka Mar, brought suit alleging failure to warn and design defect. Discovery revealed that Abbott possessed internal data linking its cow's-milk-based formulas to necrotizing enterocolitis as early as the 1970s, but never warned RaiLee's physicians, hospitals, or parents.

Necrotizing enterocolitis is a devasting and deadly disease of the intestine, affecting almost exclusively preterm infants, characterized by inflammation and injury of the gut, which can advance to bowel necrosis and perforation. R.52-35 at 10–12.

Fifty years ago, Abbott's publications recognized that necrotizing enterocolitis manifested *only* in premature infants who were fed formula. R.52 at Plaintiff's Response to Abbott's Local Rule 56.1(a)(2) Statement of Material Facts in Support of Its Motion for Summary Judgment at ¶ 63. *See also, Hall* R.614-26[1]. Recognizing this risk, in 1986, Abbott warned of necrotizing enterocolitis on its preterm formula labeling. R.52, Plaintiff's

---

[1] *Mar v. Abbott Laboratories* is associated with MDL 3026, *in re: Abbott Laboratories, et al. Preterm Infant Nutrition Products Liability Litigation.* Certain references were made within Plaintiff's responsive briefs in the District Court to documents filed in the MDL's master docket, *Hall v. Abbott Laboratories, Case No. 22-cv-00071.* References to the master docket are cited within this brief as "*Hall.*"

Response to Abbott's Local Rule 56.1(a)(2) Statement of Material Facts in Support of Its Motion for Summary Judgment at ¶ 63. *See also, Hall* R.614-27. In 1993, it sent a "Dear Doctor" letter advising healthcare providers about the dangers of feeding formula to preterm infants, identifying a causal mechanism eerily similar to Plaintiff's expert, Dr. Sucre's opinion. R.52, Plaintiff's Response to Abbott's Local Rule 56.1(a)(2) Statement of Material Facts in Support of Its Motion for Summary Judgment at ¶ 63. *See also, Hall* R.614-28. Rather than improve its formula to be safer for vulnerable preterm infants, Abbott stopped warning about the risk of necrotizing enterocolitis altogether.

Abbott did not provide a warning to Plaintiff, and Ms. Mar was not aware of the risk of NEC associated with feeding formula. *Id.* at ¶ 45. The record is devoid of evidence that Abbott provided any warning about NEC and formula feeding. This is not a question of "a more explicit warning" but rather any warning at all. *Id.* at ¶ 48.

Baby RaiLee, the subject of this wrongful death lawsuit, was born prematurely on January 1, 2014. R.52-33, 1/1/2014 CAMC Progress Note.  Despite being born at 28-weeks gestation (12 weeks early), she was doing well. R.52-2 Maxwell Dep. Her APGAR scores, an assessment of a newborn's health at one and five minutes after birth, were a 7 and 7 out of ten, surpassing most other 28-weekers. R.52-2 Maxwell Dep. at 162:9-14. She weighed 1370 grams (around 3 pounds), which is in the 95th percentile for weight at her gestational age. R.52-33, 1/1/2014 CAMC Progress Note. And when RaiLee was transported from her birth hospital to Charleston Area Medical Center (CAMC), her

transport team noted that she had a normal tone, was active and alert, and slept normally. R.52-2, Maxwell Dep. at 164:7-165:16. Routine blood work showed no infection at birth. R.52-26, 1/3/2014 CAMC Progress Note. And just two days after she was born, Baby RaiLee was breathing room air — a feat described as "very impressive". R.52-2, Maxwell Dep. at 168:5=7.

RaiLee, like all preterm infants, initially received exclusive intravenous nutrition. R.50-27, 1/1/2014 CAMC Progress Note; R.50-35, 1/1/2014 - 1/4/2014 CAMC Flowsheets. After a few days, she was started on feedings with her mother's breastmilk. R.52-2, Maxwell Dep. at 203:18-23. RaiLee was doing well on her mom's milk and was in "very good" condition according to her doctors. *Id*. at 180:1-186:25. While fed breastmilk, RaiLee had no signs of necrotizing enterocolitis. *Id.*

Although Ms. Mar pumped her own breastmilk for her daughter, the nurses made her "dump milk." R.52-30, E. Mar Dep. at 39:10-42:25. Ms. Mar's friend whose baby was in the same Neonatal Intensive Care Unit (NICU) with RaiLee was overproducing breastmilk and offered to donate her excess milk to feed RaiLee, but hospital staff refused. *Id*.

Because Ms. Mar's breastmilk supply was dwindling, RaiLee's doctors decided to supplement her feeds with Abbott's Similac Special Care (Similac). Ms. Mar had previously used Similac with her older daughter, Athena, and had no reason to believe that it was unsafe. She was never told that Similac was associated with an increased risk

5

of necrotizing enterocolitis. So, on January 14, 2014, RaiLee was placed on a mix of her mom's milk and Similac. R.50-42, 1/14/2014 - 1/15/2014 CAMC Intake and Output Log; R.52-31, DeZure Dep. at 211:1-14. Ms. Mar's breastmilk was mixed at a 1:1 ratio with Similac, meaning that half of RaiLee's food was breastmilk and half was Similac.

Within hours of first receiving formula, RaiLee's condition plummeted. Her labs showed severe inflammation, an indication of necrotizing enterocolitis. Her procalcitonin level (a biomarker for inflammation) skyrocketed, showing a >300-fold increase from previous testing. R.38-22, 1/15/2014 CAMC Discharge Report; R.52-31, DeZure Dep. at 290:35. The next day, on January 15, 2014, RaiLee "had a large bloody stool." R.52-2, Maxwell Dep. at 192:7-193:2.  She appeared "poorly perfused and lethargic" on her physical examination. *Id.* Her doctors noted "[g]ross abdominal distention," a visibly and significantly swollen belly. *Id.* Doctors immediately stopped all of RaiLee's feedings. *Id.* X-rays confirmed the doctors' worst fears: "pneumatosis intestinalis with layer indicating severe [necrotizing enterocolitis]." *Id*.

Her infection was severe. Baby RaiLee passed away on January 16, 2014, at approximately 6:00 a.m. R.50-47, RaiLee Mar CAMC Death Pronouncement; R.50-48, RaiLee Mar Death Certificate. Still, Ms. Mar had no idea the formula was to blame. R.52-30, E. Mar Dep. at 53:1-69:25, 186:8-187:20. Because Abbott failed to warn of the risk of necrotizing enterocolitis, Ms. Mar spent years wondering what caused her baby girl to become so sick, so quickly.

6

## II.     Procedural Background

Plaintiff submitted a robust case to the Court, supported by four expert witnesses. Epidemiologist, Dr. Spector, with biostatistician, Dr. Betensky opined that there is a significant increased risk of necrotizing enterocolitis when formula is fed to premature infants instead of human milk or human milk products. R.52-23, Expert Report of Logan Spector. Dr. Sucre, plaintiff's general causation expert, carefully explained the mechanism by which formula causes necrotizing enterocolitis. R.52-35, Expert Report of Jennifer Sucre. Dr. DeZure carefully reviewed RaiLee's medical records and concluded that formula was the specific cause of RaiLee's death. R.38-2, Expert Report of Dr. DeZure.

The district court granted summary judgment on Plaintiff's failure-to-warn claim, holding that Plaintiff lacked sufficient evidence of causation—specifically, that a warning would not have altered the outcome. R.96, 5/2/2025 Memorandum Opinion and Order; App. 1–21 As discussed below, the original record provided ample evidence for a jury to conclude that, had Abbott properly warned of necrotizing enterocolitis, RaiLee would have been fed differently.

Following the Court's grant of summary judgment, Plaintiff moved for reconsideration under Rule 59(e) based on new testimony which further provided support for warnings causation. Specifically, strong evidence emerged from Dr. Naomi Bar-Yam, the former director of Mother's Milk Bank Northeast, and RaiLee's father,

Anthony Mar. Dr. Bar-Yam testified that donor milk could have been shipped overnight to the hospital (R.98-2, Bar-Yam Dep. 129:7–12), while Anthony Mar testified he would not have allowed formula to be fed to his daughter had Abbott warned of the necrotizing enterocolitis risk. R.98-1, A. Mar Dep. 91:11–17. The district court denied reconsideration on August 11, 2025.

**SUMMARY OF ARGUMENT**

The district court's summary judgment order must be reversed. In granting summary judgment, the court improperly weighed and resolved disputed evidence in Abbott's favor, effectively usurping the jury's role. The Court's precedent makes clear that where multiple reasonable inferences exist—particularly regarding causation in a failure-to-warn case—those inferences must be drawn in favor of the nonmovant.

Testimony from Dr. Maxwell and Ericka Mar supported the inference that a proper warning would have changed feeding decisions. Additional testimony from Dr. Bar-Yam and Anthony Mar reinforced that donor milk was available and that the parents would have refused formula if properly warned. Any of these facts, especially when taken together, preclude summary judgment.

The district court compounded its error by denying reconsideration despite genuinely new, material evidence. Under Rule 59(e), reconsideration is warranted to prevent manifest injustice. The refusal to acknowledge this new evidence conflicts with Seventh Circuit authority and deprived Plaintiff of her right to a jury trial on disputed facts.

In granting summary judgment, the District Court necessarily concludes that RaiLee's parents and physicians would have still fed Similac Special Care despite knowing that it significantly increased the risk of Baby RaiLee developing a deadly disease—necrotizing enterocolitis. As discussed in detail below, there were sufficient

9

facts whereby a jury should have been permitted to apply its common sense to draw a

reasonable inference that a warning would have resulted in RaiLee not receiving formula.

**ARGUMENT**

**I.      STANDARD OF REVIEW**

Summary judgment rulings are reviewed *de novo*, with all facts and reasonable

inferences drawn in favor of the non-moving party. *Johnson v. Rimmer*, 936 F.3d 695, 705

(7th Cir. 2019); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The appellate court

stands in the same position as the district court and may not weigh evidence or make

credibility determinations. *Abdullahi v. City of Madison*, 423 F.3d 763, 770 (7th Cir. 2005).

**II.    THE DISTRICT COURT MISAPPLIED THE SUMMARY-JUDGMENT STANDARD AND RESOLVED FACTUAL INFERENCES AGAINST THE PLAINTIFF**

**A.      Failure-to-Warn Causation is a Question for the Jury**

Even without consideration of the "newly discovered evidence," the record

contains ample evidence that a proper warning would have changed how RaiLee Mar

was fed. This is especially true when one considers the testimony of RaiLee's treating

physician, Dr. Maxwell, viewed in the "light most favorable" to the plaintiff. *Johnson*, 936

F.3d at 709. Specifically, Dr. Maxwell testified that if Abbott had warned that Similac

Special Care increased the risk of necrotizing enterocolitis, "we would have tried, yes, to

get donor milk maybe quicker than we did." R.52-2, Maxwell Tr. 119:21–120:8. Dr.

Maxwell further testified that if he had known of the increased risk of necrotizing

10

enterocolitis, he could have used that knowledge to "fast-forward[] those bureaucratic efforts" to implement a donor-milk program." *Id.* at 120:9–120:15. Additionally, Ms. Mar testified that a friend in the NICU offered her own breastmilk to feed RaiLee. R.52-30, E. Mar Dep. at 39:10-42:25. Although the hospital rejected that alternative, a jury could fairly infer that if the NICU's doctors had known of the serious risk posed by formula, their risk-benefit analysis would have been different. Alternatively, a jury could readily infer that parents armed with the magnitude of the risk would have insisted on donor milk, and that, as required by the doctrine of informed consent, the physicians would have followed their wishes. Or, the jury could infer that Ms. Mar would have brought the donor milk into the NICU, just as she had been bringing in her own breastmilk, and told staff it was her own—bypassing the need to get hospital approval. In short, it is axiomatic that parents would pursue any measure necessary to protect their child's chance of survival.

Regardless, courts have shied away from the type of direct evidence that the District Court required, acknowledging that fair inferences are the realm of the jury. On a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in [her] favor." *Groh v. Ramirez*, 540 U.S. 551, 562 (2004) *quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The Seventh Circuit's analysis in *Cloutier v. GoJet Airlines*, LLC, 996 F.3d 426 (7th Cir. 2021), confirms that even *uncertain or counterfactual* inferences must be left to the jury

11

when reasonably grounded in the record. In *Cloutier*, the plaintiff, a pilot, prevailed at trial on his Family and Medical Leave Act claims. On appeal, the airline employer urged the court that judgment as a matter of law should have been entered because it argued the inferences plaintiff advanced "call for speculation." *Id.* at 440 and 441. Deciding for the plaintiff required the court to draw a series of arguably speculative inferences about what would have happened if the employer had warned the plaintiff of a deadline in a timely manner. *Id.* at 440. The plaintiff argued that "if I had known that I only had 12 weeks and that there was a time limit, I  would have pressed the doctor to have the test done quicker, and I would have had the paperwork into the FAA earlier so it would have all been completed maybe a week or two earlier." *Id.* at 441. Like in *Mar*, the inference was not perfect. Similar to the reasoning of the District Court here, the Defendant in *Cloutier* argued that plaintiff was not in control of the doctors, and therefore the claim that plaintiff could have pressed his doctors to complete his tests and paperwork sooner was mere speculation. *Id.* at 442. But the Seventh Circuit rejected this argument, stating that "a reasonable jury could have decided to credit that testimony and concluded that urging Cloutier's doctors to move faster would have moved the needle." *Id*. Defendant also argued that plaintiff was not in control of whether the FAA would have approved him sooner, but the Court rejected this argument stating that "[a] reasonable jury could have therefore plausibly credited the argument that if Cloutier got his tests in order more

12

quickly, then the FAA could have issued an approval at least one or two days sooner."

*Id..*

There is no doubt that the inferences urged by *Cloutier* contained a degree of speculation. Nobody knows for certain what would have happened. But as the Seventh Circuit reasoned,

> [O]ur conclusions illustrate that we view what GoJet calls 'speculation' as part and parcel of the jury's core function to determine what inferences to draw from the available evidence. Of course, to answer the question of whether Cloutier could have returned before twelve weeks, the jury was called to consider the available evidence and counterfactuals. Yet, we must draw 'all justifiable inferences' in favor of the non-movant.

*Id*.

The same principle controls here. Whether a proper necrotizing enterocolitis warning would have changed RaiLee's feeding course is inherently a counterfactual inference, no different in kind from those the Seventh Circuit held were for the jury in *Cloutier*: Would Dr. Maxwell have fast-tracked donor-milk approval? Would the NICU have accepted the offered breastmilk? Would Ms. Mar have refused to discard her own expressed milk? Would either parent have insisted on donor milk or declined formula altogether? These inferences rest on sworn testimony and undisputed circumstantial evidence—including the availability of donor milk and parental testimony about what they would have done had they been warned. And just as the pilot in *Cloutier* was entitled to have a jury evaluate reasonable inferences about what decisionmakers *would have done*,

13

Plaintiff here was entitled to have a jury assess what RaiLee's physicians and parents *would have done* with a proper necrotizing enterocolitis warning. Because the record supports more than one reasonable view of that counterfactual, the district court could not, under *Cloutier*, remove the question from the jury.

The difficulty of resolving such counterfactual, credibility-dependent questions on summary judgment is underscored by the Sixth Circuit's explanation:

> Answering the question presented by this failure-to-warn claim requires that we 'unravel the tangled skein of fact and policy' that goes by the deceptively unassuming name 'causation.' Causation issues in failure-to-warn cases present particularly knotty problems. First, they involve a series of counterfactual constructs – had you known certain facts, what would you have done? – that we use to determine 'cause in fact.' Would the doctor have changed his behavior if he had known about the drug's side effect? If so, would the doctor's actions have altered the patient's? And would the patient's altered actions have reduced the harm the drug caused her? These, like all causation issues, are 'ordinarily jury questions, unless the uncontroverted facts and inferences to be drawn from them make it so clear that all reasonable persons must agree on the proper outcome.'
> Because the answers to such questions are essentially unknowable and clouded by hindsight biases and credibility concerns (and thus especially suitable for the jury), at summary judgment these kinds of cases often hinge on the mix of moral intuition and policy judgments we call 'proximate cause.'

*Payne v. Novartis Pharmaceuticals Corp., 767 F.3d 526, 527 (6th Cir. 2014)*
[internal citations omitted]

14

The First Circuit's reasoning in *Knowlton v. Deseret Medical, Inc.*, 930 F.2d 116 (1st Cir. 1991), further illustrates why a jury—not the court—must decide warnings causation here. In *Knowlton*, the plaintiff was injured when a medical drainage device malfunctioned. *Id.* at 118. The defendant argued that the plaintiff could not prove a warning would have changed the physician's conduct. *Id.* at 123. The First Circuit rejected that contention, holding that the jury was entitled to infer that a proper warning would have altered the treatment decision because **"**[i]t is difficult to accept that a proper warning would have been deliberately ignored." *Id* at 123. The court emphasized that even without direct testimony from the prescribing physician, a jury may rely on common sense and circumstantial evidence to conclude that medical providers would act differently when armed with information about a serious risk. *Id.* at 121.

The same reasoning applies with even greater force here. Unlike *Knowlton*, Plaintiff does offer *direct testimony*: Dr. Maxwell acknowledged he would have accelerated efforts to obtain donor milk if aware of the necrotizing enterocolitis risk; Ms. Mar testified she had additional breastmilk available; and Mr. Mar stated he would have refused formula entirely had he been warned. And, as in *Knowlton*, the inference that physicians and parents would not "deliberately ignore[]" a warning about a life-threatening risk to a premature infant is not only reasonable but compelling. *Id.* at 123.

15

**B.**     **The District Court Demanded Direct Proof of a Counterfactual That Can Only Be Inferred and Also Improperly Weighed the Strength of Evidence and Competing Inferences.**

On summary judgment "a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).

As noted, *supra*, RaiLee's treating physician stated that he would have fast-forwarded bureaucratic efforts to implement a donor milk program in his NICU. The district court rejected this testimony, stating that "Plaintiff overstates the strength" of Dr. Maxwell's testimony. R.96 at 19. In doing so, the District Court weighed the "strength" of the evidence, rather than deciding whether a jury could reasonably infer from this evidence that a different feeding outcome would have occurred. It is true that it is impossible to know with certainty what would have happened if a proper warning had been given. But the nuances of weighing the relative strength of evidence and weighing the inferences in light of the facts "is a task quintessentially entrusted to the jury." *Cloutier*, 996 F.3d at 441.

The District Court also rejected Plaintiff's testimony that an alternative food source was available through a friend who offered to donate her own breastmilk. R.96 at 19. Although the court acknowledged this testimony, it dismissed it on the ground that "there is little evidence" beyond Plaintiff's deposition. That reasoning again reflects improper weighing of evidence. At summary judgment, the court was required to accept

16

Plaintiff's testimony as true and draw all reasonable inferences in her favor. If the availability of the friend's milk is taken as true—as it must—and the heightened necrotizing enterocolitis risk from formula is taken as true—as it must—then a jury could readily infer that this safer alternative would have been pursued. Issues of plausibility and credibility cannot be resolved at the summary judgment stage. *Payne v. Pauley, 337 F.3d 767, 770 (7th Cir. 2003),* citing *McDonnell v. Cournia*, 990 F. 2d 963, 967 (7th Cir. 1993). Indeed, the far less plausible inference is that physicians or parents, once warned of a life-threatening risk, would ignore an immediately available, significantly safer feeding option. A jury applying ordinary common sense could reasonably conclude that a mother armed with a proper warning would have taken every available step to protect her premature infant. The district court's refusal to credit this inference was precisely the kind of impermissible fact-weighing that summary judgment forbids.

In addition, the district court overlooked critical evidence supporting warnings causation. Plaintiff presented testimony that Ms. Mar had pumped breastmilk available for RaiLee, yet NICU staff instructed her to "dump" that milk. R.52-30, E. Mar Dep. at 39:10-42:25. A jury could reasonably infer that, had Abbott issued a proper necrotizing enterocolitis warning, Ms. Mar would not have discarded her own milk, and the treating team would not have insisted that she do so. Ms. Mar makes it clear that had she known of the risks of formula and NEC, she would have been hypervigilant and would have utilized her own milk or her own friend's milk because "it was right there." *Id.* at 194:4-

17

196:22. This evidence directly supports the inference that safer feeding options were both available and would have been used if the true risks of formula had been disclosed. By failing to credit those inferences, the district court again substituted its view of the facts for the jury's.

**III.     THE DISTRICT COURT ABUSED ITS DISCRETION IN DENYING RECONSIDERATION UNDER RULE 59(e).**

**A.     Rule 59(e) Permits Relief for New Evidence or to Prevent Manifest Injustice**

"Four grounds justify reconsideration under Rule 59(e): (1) an intervening change in the law; **(2) new evidence not available at the time of the original ruling**; (3) a clear legal error; and **(4) the prevention of manifest injustice."** *Emerick v. Wood River—Hartford School District No. 15*, No. 16-cv-0788-MJR-RJD, 2018 U.S. Dist. LEXIS 249911, at \*2-3 (S.D. Ill. Mar. 19, 2018) (emphasis added). Plaintiff's motion satisfied two of those grounds: new evidence and manifest injustice.

In denying Plaintiff's Motion for Reconsideration, the District Court reasoned that Plaintiff's new evidence was not "newly discovered." R.105 8/11/2025 Memorandum Order at 3; *App.* 25. In doing so, the court misinterpreted Rule 59(e) and applied a standard different from the language of the rule which references the "availability" of the evidence; not the "discovery" of potentially useful information. The District Court wrongly equated Plaintiff's counsel's knowledge of potential evidence with "availability" of evidence. The District Court failed to acknowledge that neither witness was under Plaintiff's control, and neither witness was a party. The record shows that once

18

Plaintiff became aware of the potentially useful information, the evidence was pursued with diligence.

It is true that Plaintiff's counsel discovered portions of the new information prior to summary judgment. As the District Court points out, Plaintiff's counsel became aware of Dr. Bar-Yam's relevant information in March 2025. R.105, 8/11/2025 Memorandum Order at 3; *App.* 25. Plaintiff first made contact with Dr. Bar-Yam on March 7, 2025. R.98-2, Bar-Yam Dep. at 93:6-10. Dr. Bar-Yam was and remained a third-party witness (not a retained expert otherwise under plaintiff's control). *Id.* at 106:5-23. Following the initial outreach to the witness on March 7, 2025, Plaintiff's counsel learned potentially helpful information. But Plaintiff did not possess "evidence," which would have required sworn testimony. Plaintiff swiftly made efforts to depose Dr. Bar-Yam. Plaintiff requested dates from defense counsel on March 18, 2025 (R.70-1) and again on March 25, 2025 (R.70-2). Defendant never provided dates but did seek leave of the Court to take Dr. Bar Yam's deposition. R.70. Leave was granted by the Court on April 18, 2025. R.76. The evidence became "available" when Dr. Bar Yam's Deposition was taken on May 1, 2025 (R.98-2), just one day before the District Court granted summary judgment. R.96.

Dr. Bar Yam's testimony was compelling. From 2006 to 2020, she was the director of Mother's Milk Bank Northeast. R.98-2, Bar-Yam Dep. at 12:1–14. Using her particularized knowledge as an officer of a milk bank, she explained that Mother's Milk Bank Northeast could have supplied donor milk overnight to feed RaiLee at CAMC. *Id.*

at 128:7–129:13; 131:19–132:3 ("Could we have gotten [donor breast milk] to them within 24 hours—one way or the other we could have gotten it to them."). In addition, she testified that during RaiLee's NICU stay, milk banks within her network existed in Columbus, Ohio (just a 2.5-hour drive from Baby RaiLee), in Indianapolis, Indiana (5 hours from RaiLee), and in Fort Worth, Texas (with the capacity to ship milk to infants in need). *Id.* at 119:25–120:20. Dr. Bar-Yam also testified that it is the practice of her milk bank, and milk banks within her network, to prioritize the distribution of milk to the most at-need infants: preterm infants. *Id.* 121:21–122:5. In other words, Baby RaiLee would have been at the top of their prioritization list. She further testified that she was not aware of any instance wherein a baby under 1,500 grams (like RaiLee) was unable to obtain donor milk. *Id.* 121:22-122:5; 123:17-20.

Anthony Mar is RaiLee's father and Plaintiff's ex-husband. Mr. Mar is not a party to this case, or otherwise under plaintiff's control. R.98-1, A. Mar Dep. at 10:21-11:8. The parties agreed to take Mr. Mar's deposition on April 23, 2025. Mr. Mar formally divorced plaintiff Ericka Mar several months before the deposition, but they had been separated since "2017 or 2018." *Id.* at 78:17-79:3. Prior to the deposition, Plaintiff's counsel did not discuss the substance of Mr. Mar's testimony. *Id.* at 12:20-24. When Defendant's counsel pressed Mr. Mar regarding any prior conversations with Plaintiff's counsel, Mr. Mar said he was told "To be open and honest and just tell the truth and then asked me if there were any closer hotels than where he was staying. That was it." *Id.* at 13:2-6. Mr. Mar was

20

pressed further: "Q. You didn't meet with [Plaintiff's counsel] to talk about the deposition or what might be asked. A. No." *Id.*

Mr. Mar's testimony is compelling. Although the District Court concluded that the Plaintiff "did not review the packaging on [Similac]," RaiLee's father did. R.96 at 19. During his deposition, Mr. Mar testified that he recalled seeing a formula bottle with a metallic top:

> Q. Do you know how the formula was administered?
>
> A. A little plastic bottle with a big round top on it.
>
> Q. Okay.
>
> A. And that was before -- yeah, yeah. That was -- I think that's what it was. It had a silver thing on top of it too.

R.98-1, A. Mar Dep., 61:1–7. When he was shown a demonstrative of Similac Special Care 24, Mr. Mar confirmed that the bottle resembled what he had seen in the NICU.

> Q. Mr. Mar, when did you see that bottle [of Similac Special Care]?
>
> A. When -- in the NICU with my daughter.

*Id.* at 91:22–92:23. Contrary to the District Court's findings, RaiLee's dad did see the Similac Special Care packaging in the NICU.

And Mr. Mar testified, unequivocally, that if he had been warned of the risk of necrotizing enterocolitis associated with Similac, he would not have allowed the product to be fed to his child:

21

> Q. And if you had been warned of the risk of formula relative to necrotizing enterocolitis, is there anything you think you would have done differently?
>
> A. Everything.
>
> Q. Can you give me a little bit better understanding?
>
> A. If I had been given that information, I would have pursued—and [Ms. Mar] would have as well, I know she would have—different avenues to feed our daughter and to make sure she got the nutrition that she needed.

*Id.* at 90:6–17 (form objection omitted).

> Q: Having the information that you have today, if there had been nothing else available to feed RaiLee, would you have agreed with the doctor's decision to feed her that?
>
> A: **No.**

*Id.* 96:21–97:1 (emphasis added).

It is a fair inference for a jury to draw that Anthony Mar would have seen a proper warning on the bottle and would have acted upon it. But Mr. Mar provided even more direct evidence. When asked how RaiLee would have been fed, Anthony testified, "[t]hrough a donor system somehow, one way or another. They would have found a different way to feed my daughter, or I would have taken her to a different hospital." *Id.* at 91:6–9. Anthony continued,

> A. The formula—if I would have been given any kind of warning or—how they correlate together, NEC and the formula do, it wouldn't have been a question of what I would have done. That wouldn't have been allowed near my daughter.
>
> Q. You would have found a way?

22

A. I would have found a way.

*Id.* at 91:11–17 (emphasis added).

But the Mars would not have had to go as far as taking RaiLee to a different hospital. The way to feed RaiLee, as Dr. Bar-Yam testified, was through donor milk that could have been delivered overnight to CAMC (before the remainder of Ms. Mar's expressed breastmilk that was in storage at CAMC had been fed to her daughter). Even without Dr. Bar-Yam's testimony, the record shows that the Mars could have obtained donor milk from Ms. Mar's friend—whose breastmilk was already being fed in the NICU to her own baby.

The depositions of Dr. Bar-Yam (May 1, 2025) and Anthony Mar (April 23, 2025) occurred after summary judgment was fully briefed and argued and on the eve of the court's decision. Both witnesses offered material testimony that closed the causation gap even further: donor milk was available within 24 hours (R.98-2, Bar-Yam Dep. 129:7-12), and the father would have refused formula if warned. R.98-1, A. Mar Dep. 91:11-17. This evidence was unavailable through no lack of diligence and was the product of depositions Abbott itself requested.

The court reasoned that because Plaintiff was aware of the witnesses before judgment, their testimony was not new or unavailable despite due diligence. *Compare Bordelon v. Chicago Sch. Reform Bd. of Trs.*, 233 F.3d 524, 529 (7th Cir. 2000). But Plaintiff could not reasonably have presented sworn testimony before the depositions occurred,

23

as neither witness was in Plaintiff's control. Critically, as summary judgment was granted, Plaintiff was preparing a supplement to her Local Rule 56.1(a)(2) Statement of Material facts. Rule 59(e) was intended for this exact situation—to correct a judgment entered without the benefit of critical evidence that later emerged.

## B.    Refusal to Reconsider Resulted in Manifest Injustice

Had the court considered the Bar-Yam and Mar depositions, it could not have found causation deficient as a matter of law. The new evidence directly addressed the court's rationale for summary judgment. By refusing to reopen the record, the court enshrined a decision based on an incomplete factual record. Where new evidence fills a previous evidentiary gap, Rule 59(e) requires reconsideration to prevent an unjust result.

## C.    Policy Considerations.

Imposing a strict, near-certainty standard for warnings causation in a case like this not only misunderstands the nature of counterfactual proof—it creates perverse and dangerous incentives. Counterfactual questions in medical-warnings cases can never be proven with direct, hindsight-free admissions. No neonatologist is going to testify that a child "would have lived" had a different product been used, and no physician is inclined to declare that her own treatment decisions contributed to a baby's death. That reluctance is human, professional, and entirely predictable. If plaintiffs were required to produce

24

that kind of impossible evidence, every failure-to-warn case involving neonatal injury would fail as a matter of law, not because warnings don't matter, but because the only people capable of answering the counterfactual are structurally incapable of doing so.

Worse still, such a standard rewards manufacturers who choose not to warn in the first place: the more significant the omission, the harder it becomes to prove what would have happened if the truth had been disclosed. The law cannot allow a defendant to benefit from its own silence. A regime that demands definitive, physician-level proof of how actors would have behaved in an alternative world does exactly that—it disincentivizes robust warnings, undermines the deterrent function of products-liability law, and erects an insurmountable barrier in precisely the cases where warnings are most critical. That is why jury-level inference, even imperfect inference, is not merely permissible; it is essential. When a manufacturer withholds information about a life-threatening risk to premature infants, the law must allow a jury—guided by testimony, circumstantial evidence, and common sense—to determine what reasonable clinicians and parents would have done had they been told the truth.

### D.    Remand Is Required

Because the denial of reconsideration rested on an erroneous view of the law and a misapprehension of material facts, it constitutes an abuse of discretion. This Court should vacate the order denying Rule 59(e) relief and remand with instructions to reinstate the failure-to-warn and design-defect claims for trial.

# CONCLUSION

For the foregoing reasons, Plaintiff–Appellant Ericka Mar respectfully requests that this Court:

1. Reverse the district court's order granting summary judgment in favor of Abbott Laboratories, Inc.;

2. Vacate the order denying Plaintiff's Rule 59(e) motion for reconsideration; and

3. Remand the case for trial on all claims, including failure to warn and design defect, so that a jury may resolve the disputed factual questions.

Respectfully submitted, this 19th day of November, 2025.

/s/ Jose Rojas

By:   JOSE ROJAS
      LEVIN, ROJAS CAMASSAR & RECK
      40 Russ Street
      Hartford, Connecticut 06106
      (860) 535-4040
      jose@lrcr.law

      *Counsel for Plaintiff-Appellant*

26

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) and Circuit Rule 32, because this document contains 5,832  words, excluding the parts of the document exempted by Fed. R. App. P. 32(f).

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 12-point Palatino Linotype style font.

Dated:  November 19, 2025

/s/ Jose Rojas
Jose Rojas
Attorney for Plaintiff-Appellant

## CIRCUIT RULE 30(d) STATEMENT

Pursuant to Circuit Rule 30(d), counsel certifies that all materials required by

Circuit Rule 30(a) and (b) are included in the Appendix.


/s/ *Jose Rojas*
Jose Rojas
Attorney for Plaintiff-Appellant

## CERTIFICATE OF SERVICE

I hereby certify that on November 19, 2025, the Brief of Plaintiff-Appellant was filed with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ *Jose Rojas*

Jose Rojas
Attorney for Plaintiff-Appellant

# APPENDIX

## TABLE OF CONTENTS TO APPENDIX

**Page**

Memorandum Opinion and Order of the Honorable Rebecca R. Pallmeyer,
    filed May 2, 2025 ...................................................................................................A-1

Judgment of the Honorable Rebecca R. Pallmeyer, filed May 2, 2025 .................................... A-22

Memorandum Opinion and Order of the Honorable Rebecca R. Pallmeyer,
    filed August 11, 2025 ........................................................................................ A-23

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE: ABBOTT LABORATORIES, ET AL., PRETERM INFANT NUTRITION PRODUCTS LIABILITY LITIGATION | MDL NO. 3026 |
| | Master Docket No. 22 C 00071 |
| This Document Relates to: | Hon. Rebecca R. Pallmeyer |
| *Mar v. Abbott Laboratories* Case No. 22 C 00232 | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Ericka Mar's infant daughter, RaiLee, was 12 weeks premature at her birth in January 2014. RaiLee never left the hospital; she died several days after birth, very soon after ingesting infant formula manufactured by Abbott Laboratories ("Abbott") for preterm infants. Ms. Mar contends Abbott's cow's-milk-based formula caused RaiLee to develop necrotizing enterocolitis ("NEC")—a devastating disease affecting preterm infants. In this lawsuit, she seeks to hold Abbott liable for her tragic loss and alleges design defect and failure to warn claims under West Virginia law.

Ms. Mar's action is one of hundreds of similar actions brought against Abbott and its competitor, Mead Johnson, consolidated before this court as MDL No. 3026. By agreement of the parties, her action was chosen as the first of four "bellwether" cases to proceed to trial before this court, with the hope of "provid[ing] significant information regarding the entire pool of cases that are part of the MDL." *In re Testosterone Replacement Therapy Prods. Liab. Litig. Coordinated Pretrial Proc.*, No. 14 C 1748, 2017 WL 2574057, at *1 (N.D. Ill. May 22, 2017). As explained here, however, the record does not support the state law claims Ms. Mar has filed in this case. Plaintiff has not been able to present evidence of a feasible alternative design to Abbott's cow's-milk formula, nor has she been able to demonstrate that Abbott's alleged failure to warn was the cause-in-fact of RaiLee's NEC. For these reasons, the court grants Abbott's motion [48] for summary judgment.

A-1

## BACKGROUND

### I.    Factual Background

The court relies on the parties' respective Local Rule 56.1 submissions[1] in providing the background to Plaintiff's claims against Abbott.  The court also assumes familiarity with its prior rulings in this case and the multi-district litigation ("MDL") proceeding, particularly its order denying Abbott's motion to exclude experts Dr. Spector and Dr. Sucre also issued today in the main docket. *See* General Causation Order [646] in No. 22 C 71.)

### A.    RaiLee's Birth and Initial Treatment

Plaintiff's daughter RaiLee was born on January 1, 2014, via emergency C-section in Summersville Regional Medical Center in Summersville, West Virginia.  (DSOF ¶ 34-35.)  She was 12 weeks early and weighed approximately three pounds—"very preterm" and "very low birthweight."  (*Id.*)  After being placed on oxygen in the delivery room, RaiLee was airlifted from Summersville Regional Medical Center to the NICU at Charleston Area Medical Center ("CAMC") in Charleston, West Virginia.  (*Id.*)  While the parties dispute the severity of her health complications immediately following her birth, it is undisputed that RaiLee experienced hypothermia, hyperoxia, and anemia, and presented symptoms of a heart defect called patent ductus arteriosus and sepsis in the days following her birth. (*See id.* ¶ 36; Resp. to DSOF ¶ 36.)

### B.    RaiLee's Feeding and NEC

For the first four days of her life, RaiLee was fed her mother's milk intravenously.  Then on January 5, she began enteral feeding.  (*Id.* ¶ 38.)  "Enteral feeding" refers to a method of feeding preterm infants that feeds milk through a tube to their stomach.  (*Id.* ¶ 39.)  Beginning on January 5, RaiLee was provided 72 enteral feedings (across nine days) of 100% milk produced by her mother.  (*Id.*)  On January 13, however, Plaintiff stopped pumping as she was not producing

---

[1]    (*See* Abbott Local Rule 56.1(a)(2) Statement of Undisputed Material Facts [50] (hereinafter "DSOF"); Pl.'s Resp. to DSOF [52] (hereinafter "Resp. to DSOF").)

A-2

adequate amounts of milk, despite her efforts, and the amount she was producing was tainted with blood.  (*Id.* at 40.)

At this point, there was no donor milk available to supplement Plaintiff's production, nor was human-milk fortifier (Prolacta)[2] available at the hospital.  (*Id.* ¶ 46.)  Plaintiff states in her deposition that a friend, Christina Stanley, who had also recently given birth, was overproducing milk and offered to donate some to feed RaiLee.  (Mar Dep. Tr. [52-30] at 39:10–41:13.)  But a nurse in the NICU (whom Plaintiff does not identify) informed Plaintiff and her friend that "we [CAMC staff] don't do that."  (*Id.*)[3]  Instead, RaiLee's treating physician, Dr. Stefan Maxwell, changed her diet to a "mixed-feeding" of 50% mother's own milk and 50% Similac Special Care 24 ("SSC24")—a cow's-milk-based formula produced by Abbott.  (DSOF ¶ 41.)  SSC24 was packaged with a warning that read "USE AS DIRECTED BY A DOCTOR."  (*Id.* ¶ 42.)  It is undisputed that Dr. Maxwell's administration of formula to RaiLee was in accordance with CAMC's feeding instructions[4] at the time.  (*Id.* ¶ 47.)

RaiLee was given three mixed feedings between January 13 and January 14.  (*Id.* ¶ 41.)  On January 14, just hours after her first ingestion of formula, RaiLee was diagnosed with surgical NEC; she passed away the following day.  (*Id.* ¶¶ 49–50.)

---

[2]      Despite its importance to this case, the parties provided little information about Prolacta and how it is manufactured.  As the court has explained in its General Causation Order, Prolacta refers to human-milk-derived infant feeding products manufactured by Prolacta Biosciences.  (*See* General Causation Order at 7 n. 12.)  The court discusses Prolacta in more depth *infra* pp. 8–9.

[3]      As explained in later depositions, CAMC policies prohibit informal donations of unpasteurized milk to prevent the transmission of any diseases from the donor to the child. (Maxwell Dep. Tr. [52-2] at 71:7–72:5; Sheridan Dep. Tr. [596-39 in No. 22 C 71] 58:11–19 (explaining reason for policy).)

[4]      Abbott attaches to its motion a worksheet that Dr. Maxwell filled out and signed recording how much (in ml/kg/day) RaiLee was fed during her ten days of life.  (*See* Abbott's Ex. 45, Feeding Schedule [50-45] at 2.)  For each entry, the sheet includes a "recommended" feeding order for "Neonates with Weight 1001-1500 Grams."  (*See id.*)  Dr. Maxwell's entries show that he ordered feedings roughly consistent with the recommended schedule, and both parties agree this was proper.

A-3

## II.    Procedural History

Plaintiff filed her complaint [1] against Abbott in the Northern District of Illinois on January 14, 2022.  (*See* Compl. at 1.)  Her complaint alleged three counts: a strict liability design defect claim asserting that Abbott's formula was unreasonably dangerous for its intended use (Count I), a broad negligence claim that Abbott failed to use reasonable care in designing, manufacturing, and marketing its cow's-milk-based products (Count II), and a strict liability failure-to-warn claim that Abbott failed its duty to the public to provide adequate warnings of the dangers and risks of its formula (Count III).  (*See generally id.* ¶¶ 42–74.)  On April 8, 2022, her case was joined with hundreds of similar claims against Abbott and Mead Johnson before this court as MDL No. 3026. (Transfer Order [15].)  On October 25, 2023, the parties selected Mar's action as one of four bellwether trials to proceed in mid-to-late 2025.  (Order [416] in No. 22 C 71.)  The trial is now scheduled to begin on May 12, 2025.  (*See* Stip. [561] in No. 22 C 71.)

In the months leading up to her trial, Plaintiff Mar has developed significant expert testimony to support her claims.  In addition to the MDL-wide general causation experts Dr. Jennifer Sucre and Dr. Logan Spector—whose reports the court discusses at length in its General Causation Order—Plaintiff has also supplied the testimony of three case-specific experts.  Dr. Chandani Dezure, a practicing pediatrician and professor of pediatrics at Stanford University, performed a differential analysis of RaiLee's medical records to conclude that Abbott's SSC24 formula was a substantial factor and but-for cause of RaiLee's NEC.  (*See generally* Dezure Rep. [52-32].)  Dr. Darren Scheer, an epidemiologist and pharmaceutical marketing consultant, opines that Abbott's labeling and marketing of its cow's-milk-based products failed to communicate the increased risk of NEC that Abbott was aware of.  (*See generally* Scheer Rep. [45-1].)  Dr. Jakki J. Mohr, a professor emerita of marketing at the University of Montana, explains how Abbott targeted their marketing and promotion of preterm infant formulas to NICUs despite knowledge of an association between formula and NEC.  (*See generally* Mohr Rep. [44-2].)

4

A-4

Abbott moved [49] for summary judgment on Plaintiff's individual claims on January 24, 2025. The matter is now fully briefed (*see* Abbott Mem. [49]; Pl.'s Opp'n [51]; Abbott Reply [53]) and the court heard oral argument on the motion at a hearing held on March 31, 2025.

## LEGAL STANDARDS

"Summary judgment is appropriate if there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law." *Dunderdale v. United Airlines, Inc.*, 807 F.3d 849, 853 (7th Cir. 2015) (citing FED. R. CIV. P. 56(a)). A genuine issue of material fact exists only if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The court's jurisdiction over this action is based on diversity under 28 U.S.C. § 1332, and the parties agree that West Virginia law controls Plaintiff's substantive design defect and failure-to-warn claims. (*See* Abbott Mem. [49] at. 3; Pl.'s Opp'n [51] at 1.)

## DISCUSSION

Abbott raises three distinct grounds for summary judgment in its motion. The first is its broadest; asserting that Plaintiff has failed to establish through her general (Dr. Sucre and Dr. Spector) and specific (Dr. Dezure) causation experts that Abbott's formula caused RaiLee to suffer from NEC. (Abbott Mem. at 6–13.) Some aspects of this argument are reiterations of what Abbott has argued in support of excluding Plaintiff's experts, which the court rejects for reasons explained in its companion ruling.[5] But the crux of Abbott's argument—that none of Plaintiff's experts can opine that a 5% formula diet causes NEC (*id*. at 11)—raises a central issue in this MDL that the parties have hotly contested: what is the right way to measure a preterm infant's exposure to formula? Abbott urges that an infant's exposure must be measured from the moment

---

[5] For example, Abbott argues here that Plaintiff has failed to prove causation because none of her experts testify to a threshold dose at which ingestion of cow's milk formula causes NEC. (*See* Abbott Mem. at 12–13.) This court has rejected the argument that Plaintiff's general causation experts *must* testify to threshold dose in its prior order. (*See* General Causation Order at 20–23.)

5

A-5

of birth to the moment they develop NEC—because RaiLee was given 72 feedings of 100% mother's milk before three feedings of 50% human milk immediately prior to developing NEC, Abbott's interpretation would result in a determination that she received a 95% human milk diet (a level of exposure that no expert has opined is toxic). Plaintiff counters that an infant's diet must be measured beginning at their first exposure to formula—because the three mixed feedings RaiLee received immediately prior to developing NEC were all 50% formula, the relevant question under Plaintiff's interpretation is whether a 50% formula diet, not 5%, can and did cause NEC in this case. (Pl.'s Opp'n at 8.) As the parties recognize, answering this question could have resounding effects across all the claims in the MDL, but the court need not answer it here. Defendants have identified reasons specific to Plaintiff's state law claims that require this court to grant summary judgment in its favor. Abbott's second ground for summary judgment is that Plaintiff's design defect claims must fail because Plaintiff has not provided evidence of a feasible alternative design to cow's-milk formula, as required under West Virginia law (Abbott Mem. at 14–16);[6] its third ground is that Plaintiff's failure-to-warn claims must fail because Abbott owed no duty to Plaintiff directly, and Plaintiff cannot establish that RaiLee's treatment at CAMC would have been any different, had Abbott given a proper warning (id. at 21–30). The court discusses these arguments in turn.

---

[6] Abbott raises other reasons that Plaintiff's design defect claims must fail as a matter of law, including arguments that Plaintiff's claim impermissibly challenges the entire category of cow's-milk-formula as defective (Abbott Mem. at 17–19) and that the testimony of medical professionals that formula is within the standard of care undermines any theory that it is unsafe for its intended use (id. at 19–21.) The court focuses on Abbott's feasible alternative argument, however, because it finds the most support in West Virginia case law and is sufficient to dispose of Plaintiff's design defect claims in this case.

6

A-6

## I.  Design Defect Claims

Plaintiff brings both a strict liability design defect claim and a negligent design claim,[7] both of which are available under West Virginia tort law.  (*See* Pl.'s Resp to DSOF ¶ 2.)  Her strict liability claim requires proof that Abbott's formula was "not reasonably safe for its intended use," determined by "what a reasonably prudent manufacturer's standard should have been at the time the product was made."  *See Morningstar v. Black & Decker Mfg. Co*., 253 S.E.2d 666, 683, 162 W. Va. 857 (1979).  Her negligent design claim requires proof that Abbott "fail[ed] to use the amount of care in designing the product that a reasonably careful designer would use in similar circumstances to avoid exposing others to a foreseeable risk of harm."  *Ford Motor Co. v. Tyler*, 896 S.E.2d 444, 452, 249 W. Va. 471 (Ct. App. 2023) (alterations omitted) (quoting W. Va. Pattern Jury Instructions ("W. Va. P.J.I.") § 424), *overruled in part on other grounds by Shears v. Ethicon, Inc*., 902 S.E.2d 775, 250 W. Va. 226 (2024).  The Supreme Court of Appeals of West Virginia (the state's highest court) has recently clarified that to meet *either* of these burdens, a plaintiff in a design defect claim must prove "an alternative, feasible design existing at the time the subject product was made would have substantially reduced the risk of the specific injury suffered by the plaintiff."  *Shears v. Ethicon, Inc*., 902 S.E.2d 775, 785, 250 W. Va. 226 (2024); *see also Ford*, 896 S.E.2d at 452, 249 W. Va. 471 (applying alternative, feasible design requirement in negligence case).[8]  Where a Plaintiff cannot provide evidence of a safer, alternative design in a

---

[7]      As noted above, Count II of Plaintiff's complaint raises a negligent design *and* a negligent failure-to-warn claim.  (*See generally* Compl. ¶¶ 54–62.)  There is no standalone negligence claim.  (*See* Resp. to DSOF ¶ ("Count I is for strict-liability design defect. Count II is for negligent design defect and failure to warn. Count III is for strict-liability failure to warn.").)  Because Abbott's argument for summary judgment on each strict liability claim applies in equal force to their negligence counterparts, the court discusses Plaintiff's negligent design claim in this section and her negligent failure-to-warn claims in the next.

[8]      In *Shears*, the Supreme Court of Appeals of West Virginia considered only a strict liability design defect case and did not touch explicitly on design defect claims in negligence.  The rule that a plaintiff bringing a design defect claim *in negligence* must prove that an alternative, feasible design existed comes from the Intermediary Court of Appeals' decision in *Ford*.  In that pre-*Shears* case, the court held that negligent design plaintiffs must prove (in line with the Third

A-7

design defect action, judgment is appropriate as a matter of law. *Nease v. Ford Motor Co.*, 848 F.3d 219, 222 (4th Cir. 2017) (applying West Virginia law) (directing judgment as a matter of law for defendant where expert testimony establishing safer alternative design was improperly admitted at trial, holding that "without any other expert testimony to establish [availability of alternative design], [plaintiffs] cannot prove their case under West Virginia law).

Abbott urges that Plaintiff has failed to present the evidence of an alternative, feasible design for its cow's milk formula that West Virginia law requires. (Abbott Mem. at 14–16.) Plaintiff responds in two ways: first, she proposes that Prolacta, a human milk-based product, was a safer, alternative design that Abbott could have manufactured instead of its cow's milk formula. (Pl.'s Opp'n at 10.) Second, that Abbott could have "ma[de] its preterm formula safer . . . by altering its components . . . or by providing an adequate warning." (*Id.*) Neither of these arguments, however, find support in the record sufficient to survive summary judgment.

### A.      Prolacta

Plaintiff's primary case for an alternative, feasible design for cow's-milk formula is the human-milk derived product Prolacta.[9] "Prolacta" refers to a class of human-derived feeding

---

Restatement of Torts) that an alternative, feasible design would have *reduced or avoided* the plaintiff's injuries. *See Ford*, 896 S.E.2d at 452, 249 W. Va. 471. The *Shears* court rejected the "reduced or avoided" language of the Third Restatement in favor of a "substantially reduced" standard, and overruled *Ford* only insofar as it adopted the Third Restatement's language. *See Shears*, 902 S.E.2d at 785, 250 W.Va. 226 ("To the extent that the West Virginia Intermediate Court of Appeals recently adopted the Restatement's standard for design defect claims in [*Ford*] it is overruled.") After *Shears*, the court understands *Ford* to hold that a plaintiff pursuing a negligent design claim (like Plaintiff here) must prove that there was an alternative, feasible design that would have substantially reduced the harm in question. Plaintiff, for her part, does not dispute that West Virginia law requires that she supply an alternative, feasible design for both her strict liability and negligent design defect claims.

[9]      Before turning to the merits of this argument, the court notes the irregular course Plaintiff has taken in pursuing this theory in her submissions. When queried through Abbott's formal interrogatories about which products she believed were safer alternative designs, Plaintiff responded that "Plaintiff has not yet determined what evidence she intends to use at trial in this matter." (*See* Pl.'s Interrog. Resps. [50-51] at 11.) Plaintiff never amended this response. Rather, she first stated her theory to pursue Prolacta as an alternative, feasible design in her response to Abbott's Rule 56.1 Statement. (*See* Resp. to DSOF ¶ 62.) Notably, Plaintiff did *not* file a Local

8

A-8

products produced by Prolacta Biosciences; this includes both a human-milk-derived fortifier and a "ready-to-feed" human-milk-derived formula.[10]    *See* Prolacta Products, https://www.prolacta.com/en/products/ (last accessed May 2, 2025).   While the record includes little information about how Prolacta is manufactured, it appears from internal Abbott documents cited by both parties that Prolacta products require donations of human milk, which Prolacta then processes into ready-to-feed preterm products.  (*See* Pl.'s Ex. U, Email Chain [52-22] at 4–5.)  The parties represent that Prolacta fortifier has been on the market since approximately 2006, while its infant formula product entered the market in September 2014 (Abbott Mem. at 7 (citing September 2014 Prolacta Press Release, https://www.prolacta.com/en/news/prolact-rtf-100-human-milk-based-premature-infant-formula-for-nicus/ (last accessed May 1, 2025)).  There is no evidence in the record, however, as to the scale at which Prolacta was manufactured during the relevant period of Plaintiff's claims.

Plaintiff's argument that Prolacta was a safer alternative to SSC24 relies solely on the testimony of her causation experts.  Plaintiff's general causation expert, Dr. Spector, conducted a meta-analysis of studies comparing NEC rates between infants fed cow's-milk products (fortifier and formula) and those fed Prolacta products and concluded that NEC was 89% more likely to occur in infants fed cow's-milk-based products.  (Spector Rep. [616-23] in No. 22 C 71, at 17.)

---

Rule 56.1 Statement of Additional Facts providing evidence in support of this theory, which would have given Abbott the opportunity to respond in a Local Rule 56.1(c)(2) Statement.  As a result of these choices, the record is significantly lacking as to basic facts about Prolacta's history, manufacturing practice, and market presence.  The court has attempted to remedy this, to an extent, by requesting the parties identify evidence in the record that provides information about Prolacta.  (*See* Order [82].)

[10]       The distinction between fortifier and formula products is poorly explained in the parties' briefs.  As explained by Abbott's MDL-wide expert Dr. Camilia Martin, fortifier products "add energy, protein, and nutrients" to human milk because "to meet the massive nutritional demands of premature infants who would otherwise be receiving nutrition from the placenta." (*See* Martin Rep. [616-25] at 9–10.)  But "[w]hen human milk is unavailable, specialty preterm infant formula is the best option for nourishing premature infants."  (*Id.* at 10.)  In other words, fortifier *supplements* key nutritional benefits to supplement an available supply of human milk, while formula *substitutes* for human milk where there is an absence of supply.

9

A-9

Relying on this finding, Plaintiff's other general causation expert, Dr. Sucre, concludes in her report that "Prolacta (or other human-milk-based fortified nutrition) are safter alternatives to [cow's-milk-based formula] and serve the same function of providing nutrition to premature infants as [formula] without substantially increasing the risk of NEC." (Sucre Rep. [616-35] in No. 22 C 71, at 16.) Plaintiff's specific causation expert, Dr. Chandani Dezure, agrees with Dr. Sucre, concluding that "safer alternatives to cow's-milk-based formulas are mother's own milk, donor milk, and human milk-based formulas, like Prolacta." (Dezure Rep. at 7.) This testimony is the extent of Plaintiff's evidence that Prolacta was an alternative, feasible design of Abbott's SSC24, but it is not enough for a reasonable jury to find in Plaintiff's favor for several reasons.

First, Dr. Sucre and Dr. Dezure's conclusions that Prolacta is a "safer alternative" must be understood in the context of their expertise and opinions. Neither is an expert on formula manufacturing, nor do they provide testimony as to how SSC24 or Prolacta are produced or distributed. As such, while their medical and clinical expertise allows Dr. Sucre and Dr. Dezure to opine that Prolacta is a safer feeding alternative to cow's milk formula, evidence of a better *treating* option is not the same as evidence of alternative, feasible *product design*. *Hornbeck v. Danek Med., Inc.*, No. CIV. A. 6:96-2559, 1999 WL 1117107 (W.D. La. Aug. 5, 1999), *aff'd*, 226 F.3d 641 (5th Cir. 2000) ("[W]hile [expert's] report may propose alternative surgical procedures that a physician may choose when treating a patient, a different procedure is not an alternative product design.") (citing *Theriot v. Danek Medical, Inc.*, 168 F.3d 253, 255 (5th Cir.1999)). It does not appear that either expert intended to testify as to alternative (much less feasible) product designs in this case. When asked in her deposition whether she was "proposing an alternative design for preterm infant formula as an expert in this case," Dr. Sucre answered with an unambiguous "[n]o, I'm not." (Sucre Dep. Tr. at 38:12–18.) That Dr. Dezure was not speaking to alternative product designs in her report should be obvious from the fact that she included "mother's own milk" and "donor milk" in her list of "safer alternatives," (Dezure Rep. at 7), two substances that no one is suggesting Abbott could manufacture.

10

A-10

Second, it is a basic matter of tort principles that an "alternative design must not be an altogether essentially different product." *Keffer v. Wyeth*, 791 F. Supp. 2d 539, 549 (S.D.W. Va. 2011) (applying West Virginia tort law) (quoting *Torkie-Tork v. Wyeth*, 739 F. Supp. 2d 895, 900 (E.D. Va. 2010)); *but see Kimball ex rel. Kimball v. RJ Reynolds Tobacco Co.*, No. C03-664JLR, 2006 WL 1148506, at *3 (W.D. Wash. Apr. 26, 2006) (holding that whether proposed alternative design is an essentially different product is question for jury). Plaintiff does not clarify whether it is Prolacta fortifier or Prolacta formula that she is claiming was an alternative design for SSC24— she refers only to "Prolacta" in general terms.[11] Insofar as she is claiming that Prolacta *fortifier* was an alternative design, there is little dispute that fortifier is a different *class* of product from formula like SSC24. Fortifiers and formula serve two different clinical purposes—fortifier adds nutrients to an available supply of mother's milk *without* adding volume. (*See* Dezure Dep. Tr. [52-31] at 386:3–387:2.) The primary purpose of formula, in contrast, in Plaintiff's words, is "as a stand-alone food source—not as supplementation." (Resp. to DSOF ¶ 56.)[12] But proposing Prolacta *formula* as an alternative, feasible design raises other issues—namely, the formula product was not "existing at the time the subject product was made" as required by West Virginia law. *Shears*, 902 S.E.2d at 785, 250 W. Va. 226.

Finally, even if the court were to grant that Prolacta were a safer, alternative design for pre-term formula and that whether it constituted an "essentially different product" was a question

---

[11]   Indeed, Dr. Sucre and Dr. Dezure, in referring to Prolacta as a "safer alternative," appear to be referring to different Prolacta products. Dr. Sucre's report only discusses Prolacta as a human-milk based fortifier, not formula. (*See* Sucre Rep. at 16.) Dr. Dezure, on the other hand, discusses Prolacta as an example of a "human milk-based formula[]." (Dezure Rep. at 7.)

[12]   Furthermore, West Virginia law requires proof that an alternative, feasible design "would have substantially reduced the risk of the specific injury suffered by the plaintiff." *Shears*, 902 S.E.2d at 785, 250 W. Va. 226. In this case, RaiLee lacked a supply of human milk, not merely nutrients. *See supra*. It thus appears Prolacta fortifier would not have been a viable substitute for 50% of her diet that would have "substantially reduced" the risk of injury.

11

A-11

for the jury, Plaintiff has presented *no evidence* as to feasibility.[13]  A key aspect to proving the availability of an alternative, feasible design is evidence that the alternative would be "be both economically and technologically feasible."  *MCI Sales & Serv., Inc. v. Hinton*, 272 S.W.3d 17, 31 (Tex. App. 2008) (cited favorably in *Shears*, 902 S.E.2d at 784, 250 W. Va. 226).  Under West Virginia law, "the expert witness is ordinarily the critical witness" to explain to the jury "complex technical problems relating to product failure, safety devices, *design alternatives*, the adequacy of warnings and labels, as they relate to *economic costs*."  *Morningstar*, 253 S.E.2d at 682, 162 W. Va. 857 (emphasis added).  Both *Shears* and *Morningstar*, moreover, confirm that proof of an "alternative, *feasible*" design is a required for plaintiff to make out a "prima facie case" for design defect; it is the plaintiff's burden to prove feasibility.  *Shears*, 902 S.E.2d at 783, 250 W. Va. 226 ("*Morningstar* effectively required proof of an alternative, feasible design to establish a prima facie case for a design defect.").  But Plaintiff Mar has submitted no documents explaining how Prolacta is manufactured, no testimony from a Prolacta witness or representative, and no expert testimony[14] opining on the feasibility of producing Prolacta given donor milk supply, intellectual property protections, and production costs.  On this record, the court is left guessing at the

---

[13]     Given that Plaintiff did not even address the question of feasibility in her brief in opposition and the general absence of basic information regarding Prolacta in the parties' submissions, the court gave Plaintiff a further opportunity to identify evidence in the *existing record* to support her claim regarding Prolacta.  (*See* Order [82].)  In responding [92], Plaintiff did not cite to documents in the record, but rather to previously unmentioned documents attached to a declaration [93] (filed separately and after the court's explicit deadline).  The court declines to consider evidence or arguments that were not raised in Plaintiff's interrogatory responses, Local Rule 56.1 response, or opposition brief.

[14]     The absence of expert testimony is particularly notable given that Plaintiff, in responding to Abbott's assertion in its Rule 56.1 Statement that "Plaintiff did not identify an alternative design when specifically asked to do so in discovery," explained her inability to identify an alternative design by arguing that "[r]equiring Ms. Mar, a layperson, to opine on the potential alternative design is patently speculative and as such precluded by FRE 602 . . . . Ms. Mar does not qualify under FRE 702 to render such testimony."  (Resp. to DSOF ¶ 62.)  Putting aside the fact that Abbott's interrogatories asked for Plaintiff's evidence and theories, not her "opinions," Plaintiff's argument recognizes that expert testimony is clearly required to establish the non-obvious conclusion that Abbott could have feasibly produced Prolacta in place of its formulas.

12

A-12

complexity of manufacturing Prolacta formula, and whether it has ever been produced at a large scale. Apart from a speculative claim that Abbott was considering "acquiring" Prolacta in 2013,[15] Plaintiff has made no showing that Abbott had the intention or capacity to replace SSC24 with Prolacta formula. Plaintiff states offhand that "Prolacta Bioscience's [the manufacturer of Prolacta] presence in the market for nearly two decades confirms that manufacturing formula from human milk is a feasible alternative to using cow's milk," (Pl.'s Mem. at 11) but without any testimony (much less expert testimony) as to the scale at which Prolacta was being produced and sold at or before RaiLee's birth, the jury would have no way to determine the economic and practical costs of Abbott manufacturing human-milk formula at the scale of SSC25.

The absence of any evidence of feasibility from Plaintiff is particularly jarring in contrast to uncontroverted evidence submitted by Abbott demonstrating significant shortfalls in the supply of donor human milk, necessarily making the production of human-milk-derived formula difficult at scale. Specifically, Abbott's expert Dr. Amanda Starc[16] opines that "the supply of donor human milk is relatively inelastic, meaning it is unlikely to rise substantially in response to changes in price, demand, or other factors" and further notes dramatic shortfalls in the availability of donor

---

[15]    (*See* Resp. to DSOF ¶ 25.) As evidence for this claim, Plaintiff cites to an email chain between various Abbott executives discussing Prolacta's business model in mid-2013 (which, at that point, was only selling fortifier). (*See* Pl.'s Ex. U, Email Chain at 7.) Far from showing an intention to acquire Prolacta or develop human-derived infant products, however, the email chain shows a lack of knowledge on the part of Abbott as to whether Prolacta could meet demand/scale of infant nutrition products, the importance of Prolacta's model relying on milk donations, and intellectual property concerns. (*See id.* at 2–3.) The email chain further shows that Abbott only considered Prolacta as a fortifier product, not a formula substituting for human milk. (*Id.* at 7.) In Plaintiff's most recent submissions (responding to the court's request for citations to the existing record), she submits *new* evidence that Abbott's plans to acquire Prolacta were more concrete in the spring and summer of 2013. (*See* Pl.'s Supp. [92] ¶¶ 13–14.) But even these new, untimely additions to the record do not suggest that Abbott (even after acquiring Prolacta) could produce Prolacta formula at a scale and cost to meet the needs of hospitals like CAMC.

[16]    The court notes that Plaintiffs in the MDL have a pending motion to exclude Dr. Starc's opinion under Federal Rule of Evidence 702. (*See* Pls. Omnibus *Daubert* Mot. [612] in No. 22 C 71.) The court's ruling on that motion is forthcoming; for now, the court has not excluded that testimony.

13

A-13

milk and human milk products in the relevant time period.  (Starc Rep. [611-10] in No. 22 C 71 at ¶¶ 83–87, 100.)  Moreover, in Prolacta Bioscience's press release announcing the availability of human-milk-derived formula in September 2014 (cited by Abbott), the company touts that "Prolacta operates the first and only pharmaceutical-grade manufacturing facility for the processing of human breast milk."   (September 2014 Prolacta Press Release, https://www.prolacta.com/en/news/prolact-rtf-100-human-milk-based-premature-infant-formula-for-nicus/ (last accessed May 1, 2025).)  Plaintiff has offered no countervailing evidence that Abbott could obtain sufficient donor milk supply or feasibly manufacture human-milk products to meet the feeding needs of NICU's in hospitals like CAMC in January 2014.

### B.      Altering Component or Warning

Plaintiff's alternative theory, that Abbott could have made its product safer by "altering its components" (Pl.'s Mem. at 10) also falters for lack of evidence.  As noted above, Dr. Sucre's testimony is that every macronutrient in cow's milk-based formula, not just one component or ingredient, contributes to the development of NEC.  (Sucre Rep. at 37–38.)  Plaintiff has supplied no testimony as to the possibility or feasibility of altering or replacing each or all of these components.

As for Plaintiff's suggestion that "an alternative, feasible design could simply be the same product with a significantly more robust warning" (Pl.'s Opp'n at 12), this merely collapses Plaintiff's design defect argument into a failure-to-warn claim.  Indeed, the case cited by Plaintiff to suggest the existence of a such an "inadequate-warning-defective-design" claim explains that such a claim is properly termed a "failure to warn" claim that is *distinct* from a challenge to the design of the product.  *See Wilkinson v. Duff*, 575 S.E.2d 335, 340, 212 W. Va. 725 (2002) ("A failure to warn cause of action covers situations when a product may be safe as designed and manufactured, but which becomes defective because of the failure to warn of dangers which may be present when the product is used in a particular manner.") (quotation omitted).  The court discusses Plaintiff's claims against Abbott's labeling and warnings in the next section; for now,

14

A-14

Plaintiff has failed to produce a workable theory of an alternative, feasible design of SSC24 sufficient to pursue a design defect claim at trial.

## II.      Failure to Warn

Plaintiff brings a strict liability failure-to-warn claim and a negligent failure-to-warn claim. For both claims, Plaintiff asserts that Abbott failed to properly inform Plaintiff and RaiLee's physicians of the extent of SSC24's causation of NEC.  (*See* Pl.'s Opp'n at 3.)  Under West Virginia law, failure-to-warn claims in strict liability and negligence share two elements critical to Abbott's motion.  First, Plaintiff must show that "it was reasonably foreseeable to the manufacturer that the product would be unreasonably dangerous if distributed without a warning" giving rise to a duty to warn. *Church v. Wesson*, 385 S.E.2d 393, 396, 182 W. Va. 37 (1989).  Second, Plaintiff must prove that the failure-to-warn was the cause in fact of RaiLee's injury (her suffering from NEC), or provide "evidence that a[n] [adequate] warning would have made a difference." *Meade v. Parsley*, No. 2:09-CV-00388, 2010 WL 4909435, at *8 (S.D.W. Va. Nov. 24, 2010) (quoting *Tracy v. Cottrell*, 524 S.E.2d 879, 890 n. 9, 206 W. Va. 363 (1999)).  Abbott's motion charges that Plaintiff has failed to establish either that Abbott owed a duty to warn (Abbott Mem. at 21–27) or that any additional warning would have made a difference given the lack of donor milk available at CAMC (*id.* at 27–30).

### A.      Duty to Warn

The court rejects Abbott's arguments that Plaintiff has failed to create a material dispute as to its duty to warn Plaintiff and her physicians of the dangers or risks of its cow's-milk-based formula products.  Central to Abbott's argument that it owed no duty to warn Plaintiff about the possible dangers is its assertion that the learned intermediary doctrine existed in West Virginia at the time of RaiLee's birth and limited its duty to a duty to warn RaiLee's physicians of non-obvious risks.  (*Id.* at 23.)  The learned intermediary doctrine is an exception to a manufacturer's general duty to warn; under the learned intermediary doctrine, "a drug manufacturer is excused from warning each patient who receives the product when the manufacturer properly warns the

15

A-15

prescribing physician of the product's dangers." *State ex rel. Johnson & Johnson Corp. v. Karl*, 647 S.E.2d 899, 902, 220 W. Va. 463 (2007) (quotation omitted).  In 2016, the West Virginia legislature passed a statute recognizing the doctrine, W. VA. STAT. § 55-7- 30(a), but Abbott urges that the statute merely codified existing law that already recognized the learned intermediary doctrine in the medical context.

Plaintiff disagrees with this reading, and she has the better of the argument.  As Plaintiff points out, the Supreme Court of Appeals of West Virginia squarely considered and rejected the learned intermediary doctrine in *State ex rel. Johnson & Johnson Corp. v. Karl*, 647 S.E.2d 899, 220 W. Va. 463 (2007).  As the court stated unambiguously in the first sentences of the case:

> In this action invoking the original jurisdiction of this Court in prohibition, a drug manufacturer asks this Court to adopt the learned intermediary doctrine as an exception to the general duty of manufacturers to warn consumers of the dangerous propensities of their products.  After thorough consideration of the learned intermediary doctrine in light of the current state of the prescription drug industry and physician/patient relationships, we decline to adopt this doctrine.

647 S.E.2d at 900–01, 220 W. Va. 463.  Abbott argues that this opinion was limited to "just declin[ing] to apply [the learned intermediary doctrine] in the context of direct-to-consumer advertising, which is not at issue here" (Abbott Reply at 10), but the court finds no such limiting language in the opinion.  Indeed, the Supreme Court of Appeals could not have used broader language in explaining the duty of drug manufacturers.[17]  *Karl,* 647 S.E.2d at 914, 220 W. Va. 463 ("[W]e now hold that, under West Virginia products liability law, manufacturers of prescription drugs are subject to the same duty to warn consumers about the risks of their products as other manufacturers.   We decline to adopt the learned intermediary exception to this general rule.") Any reasonable reading of *Karl* (not to mention the absence of *any* caselaw prior to *Karl*

---

[17]    Indeed, because infant formula is regulated as a food by the FDA (*see* 21 U.S.C. § 321(z)) there is an open question—even where the learned intermediary doctrine applies— whether infant formulas are covered by the doctrine.  *See Ferry v. Mead Johnson & Co., LLC*, 514 F. Supp. 3d 418, 433 (D. Conn. 2021) (submitting the question of whether the learned intermediary doctrine applies to Enfamil under Connecticut law to the Connecticut Supreme Court) (case was voluntarily dismissed before the certified question was answered).

A-16

discussing the learned intermediary doctrine in West Virginia) makes clear that there was no learned intermediary doctrine shielding manufacturers like Abbott from providing adequate warnings.

Putting aside the learned intermediary doctrine, however, Abbott goes on to argue that it had no duty to warn of the dangers of cow's-milk formula relative to human milk because the law does not require Abbott to warn of comparative risks.  (Abbott Mem. at 21–23.)  But Abbott finds no support in West Virginia case law for the proposition that a duty cannot exist where a product increases the risk of disease *relative* to a broad category of alternatives.  Though it cites opinions where courts have held, in other jurisdictions, that a manufacturer does not have a duty to warn of the relative benefits of different products, the cases are easily distinguishable on their facts and do not establish that a manufacturer can never have a duty to warn that there is a safer alternative. *See Pluto v. Searle Lab'ys*, 294 Ill. App. 3d 393, 396, 690 N.E.2d 619 (1st Dist. 1997) (IUD manufacturer had no duty to warn of lower risk of STDs in other forms of birth control because IUD not intended to protect from STDs); *Slisze v. Stanley-Bostitch*, 1999 UT 20 ¶ 13, 979 P.2d 317 (nail manufacturer had no duty to warn of safer model of nail because warning would "reduce the likelihood of injury so minimally that to impose the duty would be unduly burdensome"); *Cowart v. Avondale Indus*., Inc., 2001-0894, pp. 7–9 (La. App. 4 Cir. 7/3/01), 792 So. 2d 73 (holding that manufacturer had no duty to warn of safer alternative products *in addition* to adequate warnings about the hazards of product).  In this case, Plaintiff has expressed the dangers of Abbott's products, through Dr. Sucre and Dr. Spector's reports, in terms of an *increased risk* of NEC as compared to human-milk alternatives.  Should a jury be persuaded that such a risk exists and was foreseeable to Abbott, the court sees no basis to reject as a matter of law Plaintiff's theory that an adequate warning would warn of this relative risk.

### B.    Cause in Fact

Abbott's more forceful argument is that Plaintiff has failed to present evidence that an adequate warning would have made a difference in RaiLee's treatment.  As a preliminary point,

17

A-17

the only testimony that has been provided as to what an adequate warning would have been is testimony from Plaintiff's regulatory and labeling expert, Dr. Scheer, that Abbott's labeling of SSC24 should have included a warning that "human milk has a lower risk of NEC than formula" rather than the general "USE AS DIRECTED BY A DOCTOR" warning. (*See* DSOF ¶ 64.) Thus, Plaintiff must point to evidence in the record sufficient for a jury to find that such a warning, if provided, would have resulted in a different course of action by Plaintiff or RaiLee's physicians.

It is undisputed that there was no donor milk or Prolacta available at CAMC when RaiLee's diet was changed to a mixed feeding with SSC24. *See supra* p. 3. Plaintiff's various submissions in opposition, however, raise three distinct theories for how things would have been different with an adequate warning. The court addresses these theories and the evidentiary hurdles they face below.

First, Plaintiff claims that "[d]onor milk was available to RaiLee—her mother's friend volunteered it—but RaiLee's doctors refused because Abbott failed to warn." (Pl.'s Opp'n at 3.) There is little evidence concerning this offer in the record beyond Plaintiff's deposition testimony. Assuming it was made, however, there is no evidence to suggest that an adequate warning would have resulted in RaiLee's being fed the friend's unpasteurized milk. As described above, the rejection of the friend's milk does not appear to be based on the treating nurse's judgment on the relative risk of formula and donor milk, but instead on the hospital's official policy on rejecting informal milk donations given the unrelated risks of unpasteurized milk. *See supra* n. 2. Plaintiff has provided no evidence for a jury to conclude that CAMC staff would have (or could have) circumvented this policy with a stronger warning from Abbott.

Second, Plaintiff urges that "[h]ad Abbott warned about the real risk posed by SSC24, RaiLee's doctors would have recommended, and Ms. Mar would have made, a different choice about how to feed RaiLee that would have substantially reduced the risk of NEC." (Pl.'s Opp'n at 3 (no internal citation).) Plaintiff has no evidence to support this claim. So far as Plaintiff suggests that RaiLee's treating physicians would have made a different choice if there was a different

18

A-18

warning from Abbott, her claim is directly contradicted by the statements of Dr. Maxwell, RaiLee's treating physician.  When asked by Plaintiff's counsel whether a stronger warning from Abbott would have changed his decision to feed RaiLee a 50% SSC24 diet, Dr. Maxwell answered:

> Well, what else would we feed this baby? I mean, we have to have some sort of formula, if we run out of mom's milk and there was no option for donor's milk. You can't send babies home on donor's milk anyway, so we have no other option.

Maxwell Dep. at 91:20-92:5.  As for the claim that Plaintiff herself would have made a "different choice"[18] for feeding RaiLee had an adequate warning been provided, it is undisputed that Plaintiff did not review the packaging on SSC24 or any warnings and "relied on RaiLee's NICU team" to make the best choice for feeding RaiLee. (*See* Resp. to DSOF ¶¶ 43–44; Mar Dep. Tr. at 88:14–22.)  There is simply no testimony or evidence on which a jury could find that a different warning would have resulted in different actions taken by Plaintiff or the physicians.

Third, Plaintiff suggests in various responses to Abbott's Rule 56.1 Statement that "Dr. Maxwell indicated that had he known of the extent of the risk, he would have advocated sooner for a donor milk program at CAMC or Prolacta." (*See* Resp. to DSOF ¶ 45; *see also id*. ¶¶ 17, 46.)  Plaintiff's only citation, at each of these mentions, is to a small portion of Dr. Maxwell's deposition where he is asked about policy changes that he would have encouraged had he been more aware of the risks of cow's milk-based formula—but Plaintiff overstates the strength of these answers.  When asked, again by Plaintiff's counsel, whether he would have taken more steps to obtain donor milk, Dr. Maxwell testified:

> It's not that easy. It would make sense, wouldn't you think? But, you know, it took us five years before we could get donor milk. I mean, it doesn't happen that easily. You have to go through the hospital, go through the board and the foundation and all of this to get funding to get donor milk. It's not something that happens over

---

[18]    Plaintiff's briefing does not expand on what this "different choice" would have been. At the hearing held on March 31, 2025, Plaintiff's attorneys suggest that she would have transferred RaiLee to a different hospital, or otherwise not have allowed RaiLee to be fed SSC24 formula.  These representations by her attorneys, however, are unsupported by any of Plaintiff's testimony in the record, nor by evidence that donor milk or Prolacta were available in any nearby hospitals.

19

A-19

night . . . But we would have tried, yes, to get donor milk maybe quicker than we did. *I'm not sure we had that opportunity at the time.*

(Maxwell Dep. Tr. at 119:16–120:8 (emphasis added).)  In short, assuming that a stronger warning would have prompted Dr. Maxwell himself to push for a donor milk program, he can only speculate about what the results of his efforts might have been within CAMC.  And Plaintiff has entered no testimony from CAMC administrators or policymakers supporting her assertion that the warning for which she advocates would have resulted in a different world where donor milk or Prolacta were available for RaiLee.

The loss of a child is heartbreaking, and for Ms. Mar and her family, RaiLee's death is a profound tragedy.  Abbott could have made more forceful warnings about the relative risks of its formula.  The factual reality, however, is that at the time and location of this baby's birth, cow's-milk-based infant formula was the only option to feed her.  Abbott cannot be liable for its failure to warn of a better but unavailable alternative.

## III.    Impact of this Ruling on the MDL

The purpose of selecting a bellwether case is to provide information helpful to the resolution of all cases in the MDL.  The court has granted summary judgment in this case, but its holding has limited direct application to the other claims in the MDL—the court does not, for example, weigh in on Plaintiff's causation experts' ability to sufficiently prove a connection between formula and RaiLee's illness, nor does it adopt Abbott's framing that it is absence of human milk rather than the presence of cow's milk formula that causes NEC.  Other plaintiffs pursuing similar claims in this MDL may be able to produce a more thorough record as to the basic facts and manufacturing process of Prolacta formula and procure expert testimony as to the feasibility of Prolacta as an alternative design for cow's-milk-based formula at the time of their child's birth.  Similarly, as it relates to the court's opinion on Plaintiff's failure-to-warn claim, a different plaintiff may readily be able to present evidence that she or physicians would have and

A-20

could have made different decisions with different warnings from Abbott or the co-Defendant, Mead Johnson.

## CONCLUSION

Abbott's motion for summary judgment [48] is granted.  The Clerk is directed to enter judgment for Abbott.  Dates for jury selection and trial are stricken.  The parties' remaining pending motions in this case are terminated without prejudice.


ENTER:


Dated:  May 2, 2025                           _____

REBECCA R. PALLMEYER
United States District Judge

A-21

ILND 450 (Rev. 04/29/2016) Judgment in a Civil Action

# IN THE UNITED STATES DISTRICT COURT
## FOR THE
### NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| Ericka Mar, as administratrix of the estate of Railee Mar, | MDL NO. 3026<br>Master Docket No. 22 C 00071 |
| Plaintiff(s), | |
| v. | This Document Relates to:<br><br>Case No.  1:22-cv-00232<br>Mar v. Abbott Laboratories<br>Judge Rebecca R. Pallmeyer |
| Abbott Laboratories, | |
| Defendant(s). | |

## JUDGMENT IN A CIVIL CASE

Judgment is hereby entered (check appropriate box):

☐      in favor of plaintiff(s)
and against defendant(s)
in the amount of $      ,

           which ☐ includes     pre–judgment interest.
                      ☐ does not include pre–judgment interest.

Post-judgment interest accrues on that amount at the rate provided by law from the date of this judgment.

Plaintiff(s) shall recover costs from defendant(s).

---

☒      in favor of defendant(s) Abbott Laboratories
and against plaintiff(s) Erica Mar,  as administratrix of the estate of Railee Mar

Defendant(s) shall recover costs from plaintiff(s).

---

☐      other:

---

This action was *(check one)*:

☐ tried by a jury with Judge      presiding, and the jury has rendered a verdict.
☐ tried by Judge      without a jury and the above decision was reached.
☒ decided by Judge  Rebecca R. Pallmeyer  granting Defendant's  motion for summary judgment [48].


Date:   5/2/2025                 Thomas G. Bruton, Clerk of Court

                                     Christina Presslak , Deputy Clerk

A-22

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE: ABBOTT LABORATORIES, ET AL., PRETERM INFANT NUTRITION PRODUCTS LIABILITY LITIGATION | MDL NO. 3026 |
| | Master Docket No. 22 C 00071 |
| This Document Relates to: | Hon. Rebecca R. Pallmeyer |
| *Mar v. Abbott Laboratories* Case No. 22 C 00232 | |

**MEMORANDUM ORDER**

Plaintiff Ericka Mar is one of hundreds of plaintiffs in this multidistrict litigation ("MDL") who has alleged that Abbott Laboratories ("Abbott") produced a cow's-milk-based infant formula that caused her prematurely-born infant, RaiLee, to develop necrotizing enterocolitis ("NEC"). Her case was selected as the first bellwether to proceed to trial in May 2025. Days before trial, however, this court granted summary judgment in favor of Abbott, concluding that the factual record was insufficient to support a jury verdict in favor of Plaintiff on her state law failure-to-warn and design defect theories. *In re Abbott Lab'ys, et al., Preterm Infant Nutrition Prods. Liab. Litig.*, No. 22 C 00071, 2025 WL 1282749 (N.D. Ill. May 2, 2025) (hereinafter "Summ. J. Order"). Specifically, the court noted that Plaintiff had failed to present sufficient evidence of a feasible alternative to Abbott's cow's-milk-based products necessary for her design defect claims, nor had she presented evidence that a proper warning would have resulted in a change of circumstances or treatment for RaiLee. (*See generally id*.) After entry of the court's ruling, Plaintiff proposed to present "new evidence" supporting her claims and sought reconsideration of the May 2 Order under Federal Rule of Civil Procedure 59(e). (Pl.'s Mot. [100].) For the reasons described here, Plaintiff's motion provides no basis to disturb the court's prior judgment.

Rule 59(e) directs that a "motion to alter or amend a judgment" to be filed "no later than 28 days after the entry of the judgment." FED. R. CIV. P. 59(e). Reconsideration of a judgment on the merits under Rule 59(e) is an "extraordinary remed[y] reserved for the exceptional case."

A-23

*Foster v. DeLuca*, 545 F.3d 582, 584 (7th Cir. 2008).  "To establish relief under Rule 59(e), a movant must demonstrate a manifest error of law or fact or present newly discovered evidence." *Vesely v. Armslist LLC*, 762 F.3d 661, 666 (7th Cir. 2014) (quoting *Boyd v. Tornier, Inc.*, 656 F.3d 487, 492 (7th Cir. 2011)) (quotation marks omitted).

In seeking reconsideration of the court's summary judgment order, Plaintiff does not identify errors of fact or law, but instead refers to newly-discovered "testimony from two fact witnesses who were available and deposed just days before the Court granted summary judgment." (Pl.'s Mot. at 6.)  The first witness is Dr. Naomi Bar-Yam, director of Mother's Milk Bank Northeast (outside Boston, Massachusetts) at the time of RaiLee's birth (in West Virginia). At her deposition, taken by Abbott's counsel on May 1, 2025, Dr. Bar-Yam testified about human-milk banks in locations near RaiLee's hospital that could, in her opinion,[1] have provided donor milk to feed RaiLee.  (Bar-Yam Dep. [98-2] at 119:25– 120:20.)  She further testified that her own milk bank, located and serving hospitals in New England, could have gotten donor milk to RaiLee's hospital in West Virginia "within 24 hours."  (*Id.* at 131:25–132:3.)  Plaintiff contends that Dr. Bar-Yam's testimony "confirms that there were options to feed RaiLee other than" Abbott's formula that could have been provided, had Abbott properly warned of the risk of NEC.  (Pl.'s Mot. at 3.) Plaintiff's second proposed witness is Anthony Mar, Plaintiff's Ericka Mar's ex-husband and RaiLee's father, who was present at the hospital during RaiLee's treatment.  Anthony Mar was deposed on April 23, 2025, and testified that if he "had been warned of the risk of formula relative to necrotizing enterocolitis," he and Ericka "would have pursued . . . different avenues to feed our daughter and to make sure she got the nutrition that she needed."  (Anthony Mar Dep. [98-1] at

---

[1]        Though the court does not resolve the issue here, it notes that there is a dispute about whether Dr. Bar-Yam's testimony was properly disclosed as fact-witness testimony, rather than expert testimony.  Her testimony relating to the supply and capabilities of her own milk bank network would constitute lay testimony; to the extent Plaintiffs would have Dr. Bar-Yam opine on the ability of milk banks outside of her network to deliver donor milk to RaiLee's hospital, however, reasonable objections under Federal Rules of Evidence 701 and 702 would arise.

2

A-24

90:6–17.)   Plaintiff urges that this testimony is evidence that a proper warning would have made a difference: Anthony Mar would have taken steps to ensure that RaiLee received feeding "[t]hrough a donor system somehow . . . . [O]r I would have taken her to a different hospital."  (*Id.* at 91:6–9.)[2]

Dr. Bar-Yam's and Anthony Mar's testimony might be characterized as "new" in the sense that it was not in the record at the time of the court's order, but their testimony cannot be fairly understood as "newly discovered" under Rule 59(e).  Dr. Bar-Yam's proposed testimony has been known to Plaintiff since at least March 18, 2025, when—seven months after the close of fact discovery—Plaintiff disclosed to Abbott that she intended to call Dr. Bar-Yam to testify as a fact witness at trial.  (*See* Abbott Mot. to Allow Third-Party Disc. [70] at 1.)  Plaintiff provided Abbott with a summary of Dr. Bar-Yam's proposed testimony by email on March 25, 2025.  (*See* March Email Corr. [70-2] at 3.)  But Plaintiff's summary judgment submissions made no mention of Dr. Bar-Yam, did not describe or refer to her expected testimony, and did not even suggest the possibility that milk from out-of-state donor banks might have been a plausible alternative for feeding RaiLee.  Plaintiff now tries to lay blame for the delay in offering Dr. Bar-Yam's testimony on Abbott's proposing "no dates" for her deposition after the March 18 disclosure (*see* Pl.'s Mot. at 2), but to the court's understanding, there would have been no deposition at all had Abbott not moved to re-open discovery for this purpose (*see* Abbott Mot. [70]).  In any event, Plaintiff had no need to rely on her opponent's discovery efforts, as she herself had access to this witness and could have submitted Dr. Bar-Yam's evidence, now deemed "critical" (Pl.'s Mot. at 1), by way of a declaration or affidavit.

The same is true of Anthony Mar's testimony.  As Abbott notes, Anthony Mar (while not a party) has obviously been known to Plaintiff as a potential witness since the inception of the case.

---

[2]    The court observes that both Anthony Mar's and Dr. Bar-Yam's proffered testimony address Plaintiff's failure-to-warn claims.  Neither witness's testimony addresses the deficiencies the court has observed in Plaintiff's design defect claims.

3

A-25

Plaintiff announced her intention to call Anthony Mar as a live witness at trial in an email to Abbott dated April 10, 2025 (*see* April Email Corr. [100-1]) and his deposition was scheduled shortly after.  Why Plaintiff waited for Abbott to depose Anthony Mar's testimony a week before trial remains a mystery, but it cannot be said that this testimony was "newly discovered" after the court's order—Plaintiff expressed her intention to call him as a live witness nearly a month before the May 2 order.  It bears emphasis: Dr. Bar-Yam and Anthony Mar are Plaintiff's *own* witnesses, disclosed to Abbott in the final hour but known to Plaintiff long before.  If their testimony was so significant as to defeat summary judgment, as Plaintiff now suggests, she offers no explanation for her own delay in putting that testimony in the summary judgment record.

In any event, it is not clear to the court that the additional evidence Plaintiff now seeks to introduce would alter the result here.  Dr. Bar-Yam would testify that donor milk, from her milk bank or another, could have feasibly been transported to CAMC (the hospital where RaiLee was treated), but RaiLee's own physician did not see it this way; he testified that "there was no option for donor's milk" at CAMC.  (Maxwell Dep. [52-2] at 91:20–92:5.)  The question for Plaintiff's case has never been whether donor milk banks exist or whether it was technically possible to ship donor milk from Boston to West Virginia, but whether donor milk was an option *at CAMC* at the time of RaiLee's birth.  Dr. Bar-Yam admitted in her deposition that she had no contact with CAMC, with RaiLee's treating physicians, or with RaiLee's parents in 2014.  (Bar-Yam Dep. at 17:18–22:4.)  The theory, suggested for the first time on reconsideration, that an adequate warning would have resulted in Plaintiff or the physicians at CAMC getting in touch with Dr. Bar-Yam's New England-based donor milk bank is plainly speculative and unsupported by Dr. Maxwell's and Plaintiff's own prior testimony.

Anthony Mar's testimony also does not move the needle.  Plaintiff has identified lines in his deposition where he forcefully states that, had he been adequately warned, he would have taken steps to feed RaiLee without resorting to formula.  But Anthony Mar also made a critical admission: he did not observe the packaging of the Similac that RaiLee was fed in the NICU:

4

A-26

Q. Ms. Mar testified she never saw any of the packaging or labels for the formula that RaiLee was administered, and I assume you didn't either. Is that right?

MR. ROJAS: Objection.

A. I did not. No.

Q. Okay. Sorry. I'll re-ask the question. Did you see any of the packaging or labeling for the formula that RaiLee was administered?

A. No specific labels or packaging, no.

(Anthony Mar Dep. at 62:17–63:2.)[3]  In the absence of any direct communication between Abbott and Plaintiff, Plaintiff's failure-to-warn theory relies on her claim that Abbott should have included a stronger warning on the risk of NEC on the labeling and packaging of the formula products. (*See* Summ. J. Order at *9.)  Anthony Mar, like Plaintiff herself, admits that he never saw the packaging on the products used to feed RaiLee.  Mr. Mar surely would not have exposed his child to an unnecessary risk, but unless he observed the labeling and packaging of the product in question, his testimony does not support the argument that a different warning would have led to a different outcome for RaiLee.

Finally, a word on "manifest injustice."  (*See* Pl.'s Mot. at 5 (highlighting "prevention of manifest injustice" as a basis for reconsideration).)  Plaintiff's case was chosen as a bellwether on October 25, 2023.  (*See* Order [19].)  On June 6, 2024, the court adopted the parties' proposed scheduling order, closing fact discovery for Plaintiff's case on August 9, 2024, and setting the deadline for summary judgment briefing for January 24, 2025 (Abbott's brief), February 28, 2025 (Plaintiff's response), and March 14, 2025 (Abbott's reply).  (*See* Scheduling Order [520] in No. 22 C 71.)  Plaintiff had sufficient time to develop the record and to prepare or supplement her summary judgment materials and did not advise the court of a need to supplement those

---

3        In Plaintiff's attempt to supplement her Rule 56.1(b)(2) response, filed in conjunction with her motion for reconsideration, she curiously ignores this testimony when stating that "Anthony Mar, RaiLee's father, saw the Similac Special Care 24 packaging when it was fed to RaiLee in the NICU." (*See* Pl.'s 56.1 Supplement [98] ¶ 43.)  The only citation Plaintiff offers for this statement is to a portion of Anthony Mar's deposition where he identifies a bottle of Similac as looking "similar" to "[a] formula bottle in the NICU."  (Anthony Mar Dep. at 89:10–21.)

A-27

A-28

materials, not even during oral argument on the motion. The court finds no basis—either in the circumstances behind Plaintiff's "discovery" of Anthony Mar and Dr. Bar-Yam's testimony or in the substantive value of the testimony—to award the extraordinary remedy of reconsideration.

<u>**CONCLUSION**</u>

Plaintiff's motion for reconsideration [100] is denied.

ENTER:

Dated:  August 11, 2025                              _____
                                                     REBECCA R. PALLMEYER
                                                     United States District Judge

6

A-28