No. 25-2587

# United States Court of Appeals for the Seventh Circuit

---

IN RE: ABBOTT LABORATORIES, ET AL.
PRETERM INFANT NUTRITION PRODUCTS LIABILITY LITIGATION

---

ERICKA MAR, as Administratrix of the Estate of RaiLee Mar,
*Plaintiff – Appellant,*

v.

ABBOTT LABORATORIES.,
*Defendant – Appellee,*

---

Appeal from the United States District Court
for the Northern District of Illinois, Hon. Rebecca R. Pallmeyer

Case No. 1:22-CV-00232, 1:22-CV-00071

---

## BRIEF OF DEFENDANT-APPELLEE

---

Linda T. Coberly
Stephen V. D'Amore
Kelly Mannion Ellis
WINSTON & STRAWN LLP
300 N. LaSalle
Chicago, Illinois 60654
(312) 558-5600

James F. Hurst
Rebecca Fitzpatrick
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL 60654
(312) 862-2000

*Counsel for Defendant-Appellee
Abbott Laboratories*

JANUARY 20, 2026

Save As     Clear Form

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: <u>25-2587</u>

Short Caption: <u>Mar v. Abbott Laboratories</u>

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    <u>Abbott Laboratories</u>

    _____

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    <u>Winston & Strawn; Jones Day; Kirkland & Ellis LLP</u>

    _____

(3)     If the party, amicus or intervenor is a corporation:

    i)     Identify all its parent corporations, if any; and

        <u>N/A</u>

    ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        <u>N/A</u>

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    <u>N/A</u>

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    <u>N/A</u>

Attorney's Signature: <u>/s/ Linda T. Coberly</u>      Date: <u>1/20/2026</u>

Attorney's Printed Name: <u>Linda T. Coberly</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** ☑   **No** ☐

Address: <u>300 N. La Salle Dr.</u>

    <u>Chicago, IL 60654</u>

Phone Number: <u>312-558-5600</u>      Fax Number: <u>N/A</u>

E-Mail Address: <u>lcoberly@winston.com</u>

rev. 12/19 AK

Save As     Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 25-2587

Short Caption: Mar v. Abbott Laboratories

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Abbott Laboratories

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Winston & Strawn; Jones Day; Kirkland & Ellis LLP

(3)    If the party, amicus or intervenor is a corporation:

i)    Identify all its parent corporations, if any; and

N/A

ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Stephen V. D'Amore    Date: 1/20/2026

Attorney's Printed Name: Steven V. D'Amore

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** ☐    **No** ☑

Address: 300 N. La Salle Dr.

Chicago, IL 60654

Phone Number: 312-558-5600    Fax Number: N/A

E-Mail Address: sdamore@winston.com

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 25-2587

Short Caption: Mar v. Abbott Laboratories

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    ☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Abbott Laboratories

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Winston & Strawn; Jones Day; Kirkland & Ellis LLP

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        N/A

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Kelly Mannion Ellis    Date: 1/20/2026

Attorney's Printed Name:  Kelly Mannion Ellis

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** ☐  **No** ☑

Address:  300 N. La Salle Dr.

    Chicago, IL 60654

Phone Number: 312-558-5600    Fax Number: N/A

E-Mail Address: kmannion@winston.com

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 25-2587

Short Caption: Mar v. Abbott Laboratories

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Abbott Laboratories

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Winston & Strawn; Jones Day; Kirkland & Ellis LLP

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        N/A

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ James F. Hurst    Date: 1/20/2026

Attorney's Printed Name: James F. Hurst

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** ☐    **No** ☑

Address: 333 West Wolf Point Plaza

Chicago, IL 60654

Phone Number: 312-862-2000    Fax Number: N/A

E-Mail Address: james.hurst@kirkland.com

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: <u>25-2587</u>

Short Caption: <u>Mar v. Abbott Laboratories</u>

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    ☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

<u>Abbott Laboratories</u>

_____

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

<u>Winston & Strawn; Jones Day; Kirkland & Ellis LLP</u>

_____

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        <u>N/A</u>

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        <u>N/A</u>

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

<u>N/A</u>

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

<u>N/A</u>

Attorney's Signature: <u>/s/ Rebecca Fitzpatrick</u>    Date: <u>1/20/2026</u>

Attorney's Printed Name: <u>Rebecca Fitzpatrick</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  **Yes** ☐  **No** ☑

Address: <u>333 West Wolf Point Plaza</u>

         <u>Chicago, IL 60654</u>

Phone Number: <u>312-862-2000</u>    Fax Number: <u>N/A</u>

E-Mail Address: <u>rebecca.fitzpatrick@kirkland.com</u>

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................. 1

JURISDICTIONAL STATEMENT` ...................................... 6

STATEMENT OF THE ISSUES ........................................... 6

STATEMENT OF THE CASE .............................................. 6

    A.   This entire litigation rests on the well-known fact that human milk—which has irreplicable protective qualities—reduces the risk of NEC. ......................................................... 6

    B.   RaiLee Mar was born prematurely, was fed almost entirely human milk, and still developed NEC. ............................... 9

    C.   Plaintiff filed this suit, and the court granted summary judgment..... 11

    D.   Plaintiff moved for reconsideration, but the court denied the motion. ......................................................... 14

SUMMARY OF THE ARGUMENT ..................................... 18

ARGUMENT ...................................................................... 19

I.   Abbott was and is entitled to summary judgment on failure to warn because Plaintiff failed to raise a triable issue on warning causation. .......... 20

    A.   RaiLee's doctors—who Plaintiff relied on for nutrition decisions—*already knew* the information Plaintiff says Abbott should have provided. ......................................................... 20

    B.   In any event, there was nothing else to feed RaiLee. ........................... 24

        1.   The record evidence defeats any speculation that CAMC would have been able to fast-track a donor-milk program. ....... 25

        2.   There is no evidentiary basis to infer that if Abbott's label had been different, treaters at CAMC would have administered unpasteurized, untested breastmilk. ................... 33

        3.   There is no evidentiary basis to infer that Plaintiff herself would even have seen a manufacturer warning in the NICU, much less acted on it in a manner that would have avoided the need for formula. ................................................ 35

II.   The district court did not abuse its discretion in denying reconsideration.... 36

A.    The purportedly "new" evidence could have been adduced earlier, which precludes reconsideration. ........................................... 37

B.    The "new" testimony was immaterial at any rate. ............................... 40

III.   This Court can also affirm on an independent basis:  the evidence did not support a reasonable inference on medical causation. .................................... 45

IV.    Any appeal with respect to the design-defect claims is forfeited. ................... 50

**CONCLUSION** ........................................................................................ 51

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Brown v. Abbott Lab'ys,*
2025 WL 2987083 (N.D. Ill. Oct. 23, 2025)............................................ 8, 14, 48, 50

*Caisse Nationale de Credit Agricole v. CBI Indus., Inc.,*
90 F.3d 1264 (7th Cir. 1996) ............................................................ 37, 38, 39

*Cincinnati Life Ins. Co. v. Beyrer,*
722 F.3d 939 (7th Cir. 2013) ....................................................... 36, 39, 40, 43

*Cloutier v. GoJet Airlines, LLC,*
996 F.3d 426 (7th Cir. 2021) ............................................................... 31, 33

*Dellinger v. Pediatrix Med. Grp., P.C.,*
750 S.E.2d 668 (2013)........................................................................... 49

*Diggs v. Abbott Lab'ys,*
2025 WL 2377686 (N.D. Ill. Aug. 14, 2025)...................................................... 8, 27

*Dotson v. Faulkner,*
138 F.4th 1029 (7th Cir. 2025)................................................................... 50

*Edgewood Manor Apt. Homes, LLC v. RSUI Indem. Co.,*
733 F.3d 761 (7th Cir. 2013) ................................................................... 36

*Emerick v. Wood River-Hartford Sch. Dist. No. 15,*
2018 WL 11508497 (S.D. Ill.).................................................................... 38

*Harris v. CSX Transp., Inc.,*
232 W. Va. 617 (2013) .......................................................................... 45

*Howard v. Eaton Corp.,*
2016 WL 6651592 (W. Va. 2016) .......................................................... 23, 35, 36

*Johnson v. Niagara Mach. & Tool Works,*
666 F.2d 1223 (8th Cir. 1981) .................................................................. 42

*Knight v. Boehringer Ingelheim Pharms., Inc.,*
323 F. Supp. 3d 809 (S.D.W. Va. 2018)......................................................... 41

*Knowlton v. Deseret Med., Inc.,*
930 F.2d 116 (1st Cir. 1991).............................................................. 6, 29, 30

*Mays v. Chang,*
    579 S.E.2d 561 (W. Va. 2003) ............................................................. 5, 45

*Meade v. Parsley,*
    2010 WL 4909435 (S.D.W. Va. 2010) .............................................. 2, 36

*Moro v. Shell Oil Co.,*
    91 F.3d 872 (7th Cir. 1996) ................................................................ 39

*Muzichuck v. Forest Lab'ys., Inc.,*
    2015 WL 235226 (N.D.W. Va.) ........................................................... 30

*Osborn v. JAB Mgmt. Servs., Inc.,*
    126 F.4th 1250 (7th Cir. 2025) ..................................................... 19, 20

*Oto v. Metro. Life Ins. Co.,*
    224 F.3d 601 (7th Cir. 2000) .......................................................... 37, 39

*Payne v. Novartis Pharms. Corp.,*
    767 F.3d 526 (6th Cir. 2014) .......................................................... 28, 45

*Publishers Res., Inc. v. Walker-Davis Publ'ns, Inc.,*
    762 F.2d 557 (7th Cir. 1985) .............................................................. 38

*Pustejovsky v. PLIVA, Inc.,*
    623 F.3d 271 (5th Cir. 2010) .......................................................... 28, 42

*Rodriguez v. Stryker Corp.,*
    680 F.3d 568 (6th Cir. 2012) .......................................................... 29, 42

*Scheidler v. Indiana,*
    914 F.3d 535 (7th Cir. 2019) .............................................................. 50

*Shanklin v. Allis-Chalmers Mfg. Co.,*
    383 F.2d 819 (4th Cir. 1967) .............................................................. 36

*Smallridge v. Johnson & Johnson,*
    2022 WL 1417313 (N.D.W. Va. 2022) ........................................... 23, 27

*Todd v. Societe BIC, S.A.,*
    9 F.3d 1216 (7th Cir. 1993) (en banc) ............................................... 23

*Tracy v. Cottrell ex rel. Cottrell,*
    524 S.E.2d 879 (W. Va. 1999) .............................................. 2, 20, 21, 24

*Waukegan Potawatomi Casino, LLC v. City of Waukegan,*
    128 F.4th 871 (7th Cir. 2025) ........................................................ 33, 42

*Wilson v. Brown & Williamson Tobacco Corp.*,
    968 F. Supp. 296 (S.D.W. Va. 1997)........................................................ 24

*C.W. ex rel. Wood v. Textron, Inc.*,
    807 F.3d 827 (7th Cir. 2015) ................................................................ 49

*In re Zimmer, NexGen Knee Implant Prods. Liab. Litig.*,
    884 F.3d 746 (7th Cir. 2018) ................................................................ 27

## Other Authorities

Fed. R. Civ. P. 56(a) ....................................................................... 19

Fed. R. Civ. P. 59(e) ................................................. 14, 17, 36, 37, 38, 39

Local Rule 56.1........................................................................... 2

W. Va. P.J.I. § 415........................................................ 20, 21, 30, 35

W. Va. P.J.I. § 423........................................................................ 24

AAP Clinical Report (Jan. 12, 2026), https://doi.org/10.1542/peds.2025-
    073625........................................................................................ 7

Restatement (Third) of Torts: Liability for Physical and Emotional
    Harm, § 28 cmt. b ..................................................................... 45

## INTRODUCTION

This case is part of a multidistrict product-liability litigation targeting specialized preterm infant formulas, which are sold to hospitals for use by highly trained neonatologists in neonatal intensive care units (NICUs).  The claims seek to hold Abbott liable for design defect and failure to warn, among other things.  The litigation rests on the flawed theory that feeding formula to premature infants causes necrotizing enterocolitis (NEC)—a serious complication of prematurity that can occur in infants no matter what they are fed.  To support their theory, plaintiffs rely on decades of published studies showing that infants fed mostly formula have a higher incidence of NEC than infants fed mostly human milk.

*But neonatologists already know* that infants fed mostly formula have a higher incidence of NEC than infants fed mostly human milk.  And they also know *why*: because human milk has naturally occurring, irreplicable components that reduce (though do not eliminate) the risk of NEC.  These studies show that human milk is more protective, which is why neonatologists have long preferred it.  And yet neonatologists continue to use formula as an essential backup when human milk is unavailable or insufficient.

That's what happened with RaiLee Mar.  Her neonatologists knew the science, and they administered a diet that was 95% her mother's milk—the gold standard for NEC protection—plus just five teaspoons of formula, or 5% of her diet. They added this formula for a simple reason:  her mother's own milk ran out, and *there was nothing else available.*  Tragically, RaiLee developed NEC, which led to her death.  This lawsuit seeks to place responsibility for her death on Abbott.

Plaintiff's appeal concerns only a portion of the court's summary judgment ruling—the portion relating to failure to warn.  (Any argument on design defect has been forfeited.)  The failure-to-warn ruling should be affirmed for three independent reasons, each firmly grounded in the undisputed evidence—which not only fails to support Plaintiff's speculative theories but directly contradicts them.

In West Virginia (and everywhere else), a plaintiff cannot proceed on a failure-to-warn claim unless she can come forward with evidence showing that a different warning "would have made a difference."  *Tracy v. Cottrell ex rel. Cottrell*, 524 S.E.2d 879, 890 n.9 (W. Va. 1999).  In other words, Plaintiff was required to show "that a different label or warning would have" prevented the administration of formula and "avoided the [complained-of] injuries."  *Meade v. Parsley*, 2010 WL 4909435, at *5 (S.D.W. Va. 2010).  Plaintiff did not and cannot meet that burden.

***First***, Plaintiff's only proposed warning came from her regulatory expert, who criticized Abbott's warning ("USE AS DIRECTED BY A DOCTOR," Dkt. 596-43 (Similac Special Care label)) and instead proposed a warning that "human milk has a lower risk of NEC than formula" (A-17–18).[1]  *But that warning wouldn't have changed anything.*  RaiLee's parents understandably "relied on RaiLee's NICU team" for nutrition decisions (A-19), and they conceded that they never reviewed

---

[1] Citations to the short appendix bound with the opening brief are to "A-___."  Citations to "Dkt." refer to the primary MDL docket, No. 1:22-cv-00071.  Citations to "*Mar* Dkt." refer to the docket in this individual case, No. 1:22-cv-00232.  Many of the record materials supporting the summary judgment motion and decision appear on the primary MDL docket rather than the docket in *Mar* specifically.  The statement of facts submitted under Local Rule 56.1, for example, is Dkt. 596.

Abbott's labels or packaging—which means a warning, no matter how worded, could not have changed their conduct. And as for the doctors, they already knew the information in Plaintiff's proposed warning—which is so obvious that it is Neonatology 101. The treating neonatologist in this case, Dr. Maxwell, specifically confirmed that he was already "aware" "that formula feeding was associated with higher rates of necrotizing enterocolitis." Dkt. 596-2 (Maxwell Tr.) 95:7–18. Because the treaters who chose and used the product already knew the relevant information, Plaintiff's proposed warning would not have changed a thing.

**Second**, it is undisputed that in RaiLee's NICU, "cow's-milk-based infant formula was the only option to feed her" when her mother's own milk ran out. A-20. As RaiLee's neonatologist put it, "what else would we feed this baby? . . . [W]e have no other option." A-19 (quoting Dr. Maxwell).

On appeal, Plaintiff speculates that a different warning might have spurred the hospital to "fast-track" its development of a donor-milk program. But far from supporting this theory, the record contradicts it. For example, Dr. Maxwell explained that creating a donor-milk program was a time-consuming, multi-step process, which included seeking "funding" and going through "the board and foundation" and took "five years" to complete at his hospital—extending to a point over two years after RaiLee's birth. A-19–20; Dkt. 596-2 (Maxwell Tr.) 119:16–120:15. There is *no* evidence to support the inference that a warning could have resulted in donor milk being available in time for RaiLee—and indeed, the record evidence defeats that inference.

Similarly, Plaintiff speculates that a different warning would have convinced the NICU to administer unpasteurized, untested milk from an acquaintance. But the NICU staff specifically rejected that option, consistent with authoritative medical guidance that states unequivocally that unpasteurized milk "is not recommended" due to safety concerns. Dkt. 605-5 (2017 AAP Statement) at 1; *see also* Dkt. 596-9 (2012 AAP Statement) at 831. There is no evidence that a warning would have prompted RaiLee's NICU to change its clear policy—we "didn't practice that in our unit" (Dkt. 596-2 (Maxwell Tr.) 71:14–18)—particularly given its unwillingness to "assum[e] the risk of the donor mother potentially transmitting disease." Dkt. 596-39 (Sheridan Tr.) 58:11–19.

In addition, based on evidence submitted only with her reconsideration motion—which the court was well within its discretion to reject—Plaintiff claims that a different warning would have led RaiLee's West Virginia hospital to call up a random Boston milk bank out of the blue and request formula to be shipped overnight. That theory, too, defies the record. The director of that milk bank testified that she had "no contact with" RaiLee's hospital, her "treating physicians, or with RaiLee's parents in 2014," that it was "rare" to ship donor milk to a hospital without an established program, and that she could not remember *ever* having shipped milk to a hospital in West Virginia. A-24, A-26; *Mar* Dkt. 98-2 (Bar-Yam Tr.) 17:15–22:4, 113:10–114:13. And nor could the donor milk from Boston even have reached RaiLee in time. This late-produced evidence did nothing to undermine the district court's sound conclusion that "at the time and location of this

baby's birth, cow's-milk-based infant formula was the only option to feed her" when her mother's own milk ran out. A-20. And Plaintiff cannot show that the district court abused its discretion in denying reconsideration in any event.

**Third**, and warning causation aside, this Court can also affirm the judgment on an independent basis: No jury could reasonably conclude that formula *caused* RaiLee's NEC in the first place. Under West Virginia law, Plaintiff's claims required proof that RaiLee's NEC "would not have occurred" (*Mays v. Chang*, 579 S.E.2d 561, 563 (W.Va. 2003)) had the doctors supplemented her 95%-mother's-milk diet with five teaspoons of donor milk rather than formula. But there is no evidence that the mere presence of formula made the difference here. Indeed, as one of Plaintiff's experts acknowledged, studies have found that "over half" of infants with severe NEC "had been fed exclusively human milk." Dkt. 596-6 (DeZure Tr.) 120:2– 12. And as Plaintiff's experts admit, studies do not show *even an association*—much less a causal connection—between NEC and diets made up of 95% mother's milk. Thus, even if Plaintiff could prove that formula can cause NEC in *some* infants— and they most definitely cannot—they still would not be able to prove that it caused NEC in RaiLee.

RaiLee's death was a tragedy. But Abbott is not liable for it. The record here does not merely fail to support Plaintiff's theories; it directly refutes them. The treating physicians knew the risks and had no alternative feeding options, and a minimal formula exposure is not associated with NEC. The district court's judgment should be affirmed.

## JURISDICTIONAL STATEMENT`

Plaintiff's jurisdictional statement is complete and correct.

## STATEMENT OF THE ISSUES

1.      Whether the district court erred in granting summary judgment in Abbott's favor on Plaintiff's failure-to-warn claims for lack of warning causation.

2.      Whether the district court abused its discretion in denying Plaintiff's motion for reconsideration, which rested on testimony that was available to Plaintiff all along and that did not raise a triable issue at any rate.

3.      Whether the judgment should also be affirmed for lack of *medical* causation, given that Plaintiff and her experts cannot show even an *association*— much less causation—between formula feeding and NEC for infants like RaiLee Mar, whose diet was 95% human milk.

## STATEMENT OF THE CASE

### A.     This entire litigation rests on the well-known fact that human milk— which has irreplicable protective qualities—reduces the risk of NEC.

This case is part of a nationwide litigation that rests on an alleged failure to warn about something that has been common knowledge in NICUs for decades. Neonatologists have long known that the "use of human milk confer[s] unique nutritional and nonnutritional benefits."  Dkt. 596-9 (2012 AAP Statement) at e837. The American Academy of Pediatrics—the world's leading organization in standardizing NICU care—has said this for decades, beginning with its earliest guidelines dating back to the end of the Second World War.  With respect to NEC specifically, the AAP's published guidelines have pointed to studies showing that

"feeding preterm infants human milk is associated with a significant reduction (58%) in the incidence of necrotizing enterocolitis (NEC)." *Id.* at e829 (citing studies dating back to the 1980s). The AAP also reported on one study of "preterm infants fed an exclusive human milk diet compared with those fed human milk supplemented with cow-milk-based infant formula products"—a study that "noted a *77% reduction in NEC.*" *Id.* (emphasis added). These guidelines echoed what published literature had long reported: "Human milk is the preferred feeding for all infants, including low-birth-weight infants. Studies have established a wide range of advantages over formula including . . . reduced rates of NEC and late-onset sepsis, and improved neurodevelopmental outcomes." Dkt. 596-13 (Abbott publication from 2013) at 5 (citing studies). Abbott itself has pointed to these guidelines and studies—among other published materials highlighting the benefits of human milk—in educational materials it provides to NICU staff. *See id.*; *see also* Dkt. 596 (Abbott's SOF) ¶¶ 27–29.

It is no surprise, then, that human milk is the first choice of neonatologists (Dkt 596-3 (Sucre Tr.) 104:1–9), as it was for the treaters in this case. And although pasteurized donor milk is the "next best alternative" (*id.*), not all NICUs even today have access to it,[2] and those that do may have a limited supply and thus need to conserve its use for the most vulnerable infants. That leaves cow's-milk-based

---

[2] AAP Clinical Report (Jan. 12, 2026), https://doi.org/10.1542/peds.2025-073625 (reporting that even as of 2024, human donor milk still "is not available in every NICU that cares for [very low birthweight] infants when [mother's own milk] is not available").

formula, which Plaintiff's own neonatology experts agree is "a critically important option for premature infants" in the NICU. *Id.* at 104:10–17. Preterm formula—which has been specifically formulated to meet the unique nutritional needs of premature infants—has played this critical role as a backup to human milk in the NICU for "almost 50 years." Dkt. 596-6 (DeZure Tr.) 182:4–14. It meets the "massive nutritional needs of preterm infants in the absence of human milk from either a donor or mother." *Brown v. Abbott Lab'ys*, 2025 WL 2987083, at *10 (N.D. Ill. Oct. 23, 2025) (in another case in the MDL, granting summary judgment in Abbott's favor on this basis; no appeal filed).

In light of this extensive history and published literature, it is fanciful for anyone to suggest that a trained neonatologist is unaware of the importance of human milk, including its role in reducing NEC risk. Neonatologists are highly trained pediatricians who complete an extra three-year fellowship to focus on caring for preterm infants in the NICU, which amounts to a decade of post-college medical education. Dkt. 596-6 (DeZure Tr.) 22:15–23:21. Given that preterm infants have "complex nutrition needs" that need to be evaluated alongside "clinical growth and development requirements" (Dkt 596-3 (Sucre Tr.) 103:21–25), mastery of optimal feeding practices is a cornerstone of a neonatologist's expertise. That mastery necessarily includes knowledge about how human milk reduces the risk of NEC. *See, e.g., Diggs v. Abbott Lab'ys*, 2025 WL 2377686, at *7 (N.D. Ill. Aug. 14, 2025) (in another NEC case, granting summary judgment on other grounds but noting "other concerns about Plaintiff's theory of causation," including that the neonatologist in

– 8 –

that case "has long been aware of the lower risk of NEC from mother's milk"—even testifying that a warning about a "77%" risk reduction "would only 'reinforce what [he] ha[s] always been doing'" in his practice).

The summary judgment record here is consistent with all of this. The neonatologist who treated RaiLee Mar testified that at the time of her feeding, he knew "formula feeding" is "risk factor for NEC" and "is associated with higher rates of" NEC rates than human milk." Dkt. 596-2 (Maxwell Tr.) 95:7–23, 218:18–23.

## B. RaiLee Mar was born prematurely, was fed almost entirely human milk, and still developed NEC.

Plaintiff's daughter RaiLee was born on New Year's Day in 2014 at a hospital in Summersville, West Virginia. *Mar* Dkt. 1 ¶ 5. She was born by emergency C-section after doctors found that her mother had placenta previa and bacterial vaginosis. *Mar* Dkt. 596 (Abbott's SOF) ¶ 34. Her birth came twelve weeks early, and she weighed only three pounds, which meant that she was considered "very preterm" and "very low birthweight." *Id*.

From the start, RaiLee was at an elevated risk of developing NEC. While she was in utero, RaiLee was exposed to various health issues, including maternal chorioamnionitis (an inflammation of the amniotic membranes) and her mother's prenatal cigarette use (as many as four packs per day during pregnancy). *Id*. ¶¶ 31–32; *Mar* Dkt. 596-20 (Birth Certificate Questionnaire) at 4 (Plaintiff's smoking history during pregnancy). Like prematurity and low birthweight themselves, these exposures are associated with an increased risk of NEC. *Mar* Dkt. 596 (Abbott's SOF) ¶¶ 4, 31–32.

Given the seriousness of her condition at birth, RaiLee was airlifted from the hospital where she was born to the NICU at the Charleston Area Medical Center ("CAMC") in Charleston, West Virginia. *Id.* ¶ 35. In the days after her birth (and before she received any formula), RaiLee battled multiple health complications that further increased her risk of NEC, including hypothermia, hyperoxia, anemia, a potential heart defect, and potential sepsis. *Id.* ¶¶ 36–37. In short, she was already very sick and at a high risk of NEC no matter what nutrition she received.

After four days of intravenous nutrition, RaiLee was fed through a tube into her stomach—a feeding method called "enteral" feeding. (This four-day delay in initiating enteral feedings is yet another thing that may have increased her risk of NEC. *Id.* ¶ 38.) Beginning with her first enteral feeding on January 5, her feedings consisted entirely of her mother's own milk, which her mother had pumped and provided to the medical team. *Id.* ¶ 39. By January 13, though, RaiLee's mother had to stop pumping because she was not producing adequate milk—and because the small amount of milk she was able to produce was tainted with blood due to over-pumping. *Id.* ¶ 40.

But RaiLee still needed adequate nutrition, and no other human milk was available in the NICU at CAMC. *Id.* ¶ 46. As a result, the medical team supplemented her mother's reserved breastmilk with small amounts of Abbott's Similac Special Care 24 formula, consistent with the hospital's standard feeding instructions. *Id.* ¶ 47. Between January 14 and January 15—after having administered 72 feedings of her mother's own milk—the medical team gave RaiLee

– 10 –

three feedings containing Similac Special Care 24, mixed with equal parts of her mother's own milk. *Id.* ¶¶ 39, 41. In total, this amounted to about five teaspoons of formula. *Id.* RaiLee's mother later testified that she did not see the formula or read any label or packaging before the team administered these feedings. *Id.* ¶ 43.

RaiLee was diagnosed with NEC on January 15. *Id.* ¶ 49. This was just the diagnosis, however; the record shows that NEC could take "days to weeks" to develop. Dkt. 596-6 (DeZure Tr.) 281:2–19, 379:22–25. By the time of RaiLee's diagnosis, 95% of her diet had been mother's own milk. Dkt. 596 (Abbott's SOF) ¶ 49. She tragically passed away the next day. *Id.* ¶ 50. Her immediate causes of death were listed as NEC and prematurity, with hypotension and sepsis listed as other significant conditions leading to death. *Id.* ¶ 51.

## C.    Plaintiff filed this suit, and the court granted summary judgment.

Plaintiff filed this lawsuit on behalf of RaiLee's estate on January 14, 2022, asserting claims for strict-liability design defect, failure to warn, and negligence. *Mar* Dkt. 1. Her complaint alleged that Abbott's Similac Special Care 24 formula is defective and dangerous because it is derived from cow's milk, and that Abbott should have warned that formula feeding increases the risk of NEC in premature infants as compared with feeding human milk. *E.g.*, *id.* ¶¶ 49, 60. The case became part of an MDL pending before the Honorable Rebecca Pallmeyer.

This case was chosen by the plaintiff group as the first of four "bellwether" cases to proceed to trial in the MDL, with the hope of "provid[ing] significant information regarding the entire pool of cases that are part of the MDL." A-1 (summary judgment order). Fact discovery closed in August 2024, and Abbott

moved for summary judgment on all claims in January 2025 in accordance with the case management order.  A-27 (reconsideration order, reflecting same).

After briefing and oral argument, the district court granted summary judgment in Abbott's favor, ruling that "the record does not support the state law claims Ms. Mar has filed in this case."  A-1.

Beginning with Plaintiff's design-defect claims, the district court focused on the problem of "an alternative, feasible design"—a required element of a design-defect claim under West Virginia law.  A-7 (citing cases).  The Court considered and rejected Plaintiff's assertion that Abbott could have made formula out of human milk—an argument Plaintiff made based on the existence of Prolacta, an expensive, niche nutrition product made from human milk purchased from nursing mothers.  Among other things, the court concluded that Plaintiff had provided no evidence of the economic or technological feasibility of manufacturing human-milk-based formula at the scale necessary to replace Abbott's cow's-milk-based formula and meet the nutritional demands of preterm infants in NICUs nationwide.  A-12–13.  On the contrary, uncontroverted expert evidence submitted by Abbott showed that the supply of human milk is not sufficient for Abbott to "feasibly manufacture human-milk products to meet the feeding needs of NICU's[.]"  A-13–14.  This record entitled Abbott to judgment on design defect as a matter of law.  (The merits of the design defect ruling are not before this Court on appeal.  *See infra* Part IV.)

Turning next to the failure-to-warn claims, the court agreed with Abbott that "Plaintiff has failed to present evidence that an adequate warning would have made

a difference in RaiLee's treatment." A-17. The court started by finding that the only alternative warning Plaintiff had disclosed and supported in discovery was that "'human milk has a lower risk of NEC than formula.'" A-18 (quoting Plaintiff's regulatory expert Dr. Scheer). The court went on to conclude that such a warning would not have made a difference here, because "at the time and location of this baby's birth, cow's-milk-based infant formula was the only option to feed" the infant. A-20. As the court held, Abbott "cannot be liable for its failure to warn of a better but unavailable alternative." *Id.* The court also walked through Plaintiff's various hypotheses about how a different warning could have reached relevant decisionmakers to alter the course of RaiLee's feeding—the same ones Plaintiff raises here on appeal (*see* Part I.B. *infra*). The court rejected each one in turn, finding that none had sufficient evidentiary support. A-18–20. On this basis, the court entered summary judgment for Abbott on May 2, 2025.

Having rejected both of Plaintiff's theories on their merits, the court did not need to reach the broader causation arguments that Abbott had raised, including one focused on the MDL plaintiffs' inability to show even an association—much less causation—between formula feeding and NEC for infants who (like RaiLee) had received 95% human milk. A-5–6. That issue was ripe for decision because the underlying facts were undisputed: RaiLee Mar received "72 feedings of 100% mother's milk before three feedings of 50% human milk [and 50% formula] immediately prior to developing NEC" (A-6), and Abbott had presented undisputed evidence that this amounted to a total diet that was 95% human milk (Dkt. 596-8

(Martin Rep.) at 39; Dkt. 596-6 (DeZure Tr.) 259:1–3 (Plaintiff's specific-causation expert: "Q. Okay.  She got approximately 95 percent mom's own milk, right?  A. Yeah, she did.")).  But the court ultimately deferred decision on this issue, finding a lack of clarity about "the right way to measure a preterm infant's exposure to formula" (A-5)—a dispute that on Plaintiff's side consisted only of attorney argument, with Plaintiff's counsel arguing that RaiLee's diet was 50% formula by focusing on only the last three feedings.

In a subsequent bellwether case, however, the district court concluded that Abbott was right on this measurement issue: even the studies on which Plaintiff's own expert had relied "measure[] diet over the course of all feeds, rather than from the first feed of [cow's-milk-based formula]."  *Brown*, 2025 WL 2987083, at *7 (ultimately granting summary judgment in Abbott's favor on other grounds).  And "[n]one of Plaintiffs' experts have offered an opinion on whether a diet of just 10% [formula] can cause NEC."  *Id.* at *8.  As Abbott explains in Part III below, this issue of medical causation provides an additional and independent basis for affirming the judgment.

**D.    Plaintiff moved for reconsideration, but the court denied the motion.**

Plaintiff moved for reconsideration under Rule 59(e), asking to present "new evidence" supporting her failure-to-warn claims.  A-23.  The motion presented deposition testimony from two fact witnesses Plaintiff intended to call at trial.  Dr. Bar-Yam was the director of Mother's Milk Bank Northeast, a donor-milk bank located outside of Boston, Massachusetts at the time of RaiLee's birth in West Virginia.  A-24.  Anthony Mar is RaiLee's father and was present at the hospital

– 14 –

over the span of RaiLee's treatment.  A-24.  Plaintiff announced her intent to call Dr. Bar-Yam and Mr. Mar as witnesses at trial more than seven months after the close of fact discovery (A-25) but before summary judgment was resolved.

Plaintiff listed Dr. Bar-Yam as a witness on March 18 and gave Abbott a summary of her anticipated testimony on March 25—thus confirming that Plaintiff's counsel had spoken with her before appearing at the summary judgment hearing on March 31.  A-24.  As soon as she was disclosed as a potential witness, Abbott quickly sought leave to reopen discovery to depose her.  *Id.*  The court granted that leave on April 18 (Dkt. 76), and Abbott took her deposition less than two weeks later, on May 1, while the summary judgment motion was still pending.  With Plaintiff's counsel representing her at the deposition, Dr. Bar-Yam testified (among other things) that her milk bank in New England could have shipped donor milk to RaiLee within 24 hours, if CAMC had requested it.  A-24.  But she also said she had no preexisting relationship with any relevant people; "she had no contact with CAMC, with RaiLee's treating physicians, or with RaiLee's parents in 2014."  A-26.  And she conceded that it was "rare" to ship donor milk to a hospital that did not have an established donor-milk program, and that she could not recall ever having shipped donor milk to *any* hospital in West Virginia.  *Mar* Dkt. 98-2 (Bar-Yam Tr.) 17:15–22:4, 113:10–114:13.  Dr. Bar-Yam's testimony also made clear that the parents could not obtain donor milk themselves; "the hospital had to approve it."  *Id.* at 113:24–25.

As for RaiLee's father, Plaintiff informed Abbott of her plan to call Mr. Mar as a trial witness on April 10, while the summary judgment motion was pending. A-26.  Abbott acted swiftly and took his deposition on April 23.  A-24.  Represented by Plaintiff's counsel, Mr. Mar testified (among other things) that if he "had been warned of the risk of formula," he and Plaintiff "would have pursued . . . different avenues to feed [their] daughter[.]"  A-24–25.  But he also admitted that while he recalled seeing a formula bottle in the NICU, he had never picked it up and never read any product labels or packaging.  *See infra* at 40–41 (collecting testimony). And like Plaintiff herself, he confirmed that he too relied on RaiLee's medical team to make the best decisions about her nutrition.  *Id.*

In her motion for reconsideration, Plaintiff painted this evidence as "testimony from two fact witnesses who were available and deposed just days before the Court granted summary judgment" (*Mar* Dkt. 100 (Pl's Mot. 6)), even though it was *Abbott* that deposed them, with Plaintiff's own lawyers defending the deposition.  According to Plaintiff, each deposition revealed "critical information" that would allow a jury to find that an adequate warning would have resulted in a different treatment for RaiLee.  *Id.* at 1.  The motion did not explain Plaintiff's failure to obtain and present this information from her witnesses earlier.

The district court denied the motion, emphasizing that "Dr. Bar-Yam and Anthony Mar are Plaintiff's *own* witnesses, disclosed to Abbott in the final hour but known to Plaintiff long before."  A-26 (emphasis in original).  The court observed that Plaintiff had "no need to rely on her opponent's discovery efforts" to reveal

what these witnesses knew; Plaintiff had access to the witnesses and could have secured a declaration at any time to obtain this supposedly "critical" evidence." A-25. And considering that Plaintiff was once married to Mr. Mar, the court found it "a mystery" "[w]hy Plaintiff waited to depose Anthony Mar's testimony a week before trial," as he "ha[d] obviously been known to Plaintiff as a potential witness since the inception of the case." A-26. So, the court reasoned, while the testimony "might be characterized as 'new' in the sense that it was not in the record at the time of the court's order," it was by no means "newly discovered" and thus could not justify relief under Rule 59(e). A-25. As explained below, the court used the correct standard for this evidence and then determined it had not been met.

Moreover, the district court found that the evidence did not "move the needle" in Plaintiff's favor at any rate. A-26. The court observed that Dr. Bar-Yam's testimony that she could have shipped donor milk if asked was "plainly speculative and unsupported" by the record, and Mr. Mar also made a "critical admission" that undermined warning causation: "he did not observe the packaging of the Similac that RaiLee was fed in the NICU" and therefore would not have seen a more robust warning if one had been provided. A26–27. And further, in rejecting Plaintiff's argument based on "manifest injustice," the court noted that Plaintiff's case had been identified as a bellwether case a year and a half earlier. A-27. The court observed, "Plaintiff had sufficient time to develop the record and to prepare or supplement her summary judgment materials and did not advise the court of a need to supplement those materials, not even during oral argument on the motion." A-

27–28.  Finding "no basis" to grant "the extraordinary remedy of reconsideration," the court denied Plaintiff's motion.  A-28.  This appeal followed.

## SUMMARY OF THE ARGUMENT

1.     The district court was right to grant summary judgment in Abbott's favor on the claims for failure to warn, as Plaintiff could not prove that a different warning by Abbott would have caused RaiLee's doctors to give her something other than formula.  Plaintiff herself understandably deferred to RaiLee's medical team with respect to her nutrition, and RaiLee's treating physician testified unequivocally that he already knew that human milk has a lower risk of NEC than formula.  And moreover, the record directly contradicts Plaintiff's hypotheses about "changed feeding decisions."  Br. 9.  Because speculation is insufficient to raise a triable issue on warning causation—and, indeed, the evidentiary record affirmatively *contradicts* Plaintiff's claim that a different warning from Abbott would have produced a different treatment for RaiLee—the district court's summary judgment ruling on Plaintiff's failure-to-warn claims should be affirmed.

2.     The district court acted well within its discretion in denying reconsideration.  The purportedly "new" evidence was given by two witnesses known to Plaintiff before the summary judgment record closed, and she failed to explain why she could not have secured a declaration from them at that time.  And in any case, neither offered testimony that, if credited, would have precluded entry of judgment in Abbott's favor.  There was no abuse of discretion here.

3.     This Court may also affirm the judgment on an alternative basis: Plaintiff cannot prove that a 5% formula supplement was a "but for" cause of NEC

in this case.  As the undisputed record shows, studies do not show even an association between formula feeding and NEC at that ratio, much less causation.  RaiLee received a diet made up of 95% human milk, so she got whatever protection human milk could have provided.  The absence of evidence on "but for" causation—a critical element of all of Plaintiff's claims—independently entitles Abbott to judgment as a matter of law.

4.     Plaintiff has forfeited any effort to revive her claims for design defect.  Although her brief ostensibly seeks a remand for trial on the design defect claims—along with the claims for failure to warn—the brief does not assert any basis to find that the district court erred in awarding summary judgment on those claims in Abbott's favor.  Any appeal as to those claims has been forfeited.

## ARGUMENT

Summary judgment rulings are reviewed *de novo*, with all facts and reasonable inferences drawn in favor of the non-moving party.  *Osborn v. JAB Mgmt. Servs., Inc.*, 126 F.4th 1250, 1258 (7th Cir. 2025).  Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *Id.* (quoting Fed. R. Civ. P. 56(a)).  "If the nonmoving party will bear the burden of proof at trial," as Plaintiff does here, "that party must designate specific facts showing that there is a genuine dispute such that the court should allow her claim to proceed."  *Id.* (cleaned up).  That requires the nonmovant to "come forward with enough evidence to place her version of events beyond the level of mere speculation or conjecture."  *Id.* (cleaned up).  "Conclusory evidence offered without a factual foundation is insufficient."  *Id.*

**I.    Abbott was and is entitled to summary judgment on failure to warn because Plaintiff failed to raise a triable issue on warning causation.**

West Virginia law imposes failure-to-warn liability only "where there is evidence that a warning would have made a difference."  *Tracy*, 524 S.E.2d at 890 n.9 (approving jury instruction).  Under this standard, a plaintiff "must establish that the warning suggested by [him] would have caused [a relevant person] to act differently or otherwise change his behavior in a manner which would have avoided [the subject] death."  *Id.*; W. Va. P.J.I. § 415 (same effect).  As discussed below, Plaintiff's evidence was insufficient to raise a jury question on warning causation.  On this record, no reasonable jury could conclude that the warning Plaintiff proposed in this case—that "human milk has a lower risk of NEC than formula"— would have made any difference in terms of what RaiLee was fed.

**A.    RaiLee's doctors—who Plaintiff relied on for nutrition decisions—*already knew* the information Plaintiff says Abbott should have provided.**

Any assessment of warning causation must start with a clear understanding of what a proper warning would have said.  Here, the district court found that the only proposed warning Plaintiff presented in discovery was the one proposed by her regulatory expert Dr. Scheer, who testified that Abbott's label "should have included a warning that 'human milk has a lower risk of NEC than formula.'"  A-18 (quoting Dr. Scheer).  The district court limited Plaintiff to this theory.  *Id.* (observing that this was the only warning presented, so "Plaintiff must point to evidence in the record sufficient for a jury to find that *such a warning*, if provided, would have resulted in a different course of action by Plaintiff or RaiLee's physicians")

– 20 –

(emphasis added).  Plaintiff has not challenged this part of the district court's ruling on appeal, much less showed that it constituted an abuse of discretion.

Plaintiff cannot show that the warning proposed by Dr. Scheer would have caused anyone to "act differently" (*Tracy*, 524 S.E.2d at 890 n.9) because *RaiLee's doctors already knew it*.  Plaintiff testified unequivocally that she relied on RaiLee's doctors to advise on and handle RaiLee's feedings.  Dkt. 596 (Abbott's SOF) ¶¶ 43–44.  Here is the relevant passage:

> Q. Fair to say that you relied on RaiLee's NICU team to determine what was the best nutrition for her once your breast milk was no longer available?
>
> A. Yes.
>
> Q. And did you trust the NICU team's medical judgment?
>
> A. Yes.  [*Id.* ¶ 4 (quoting Dkt. 596-41 (Mar Tr.) 88:14–22) (form objection omitted).]
>
> ***
>
> Q. And did you understand that the doctors and the NICU staff were in a better position than you to weigh the risks and benefits of RaiLee's nutrition options?
>
> A. Yes.  [Dkt. 596-41 (Mar Tr.) 92:21–93:1 (form objection omitted).]

Indeed, this is exactly what Abbott's label—had Plaintiff seen it—would have instructed her to do.  Dkt. 596-43 (Similac Special Care product label) ("USE AS DIRECTED BY A DOCTOR").  And RaiLee's doctors, in turn, testified that they *already knew* that "human milk has a lower risk of NEC than formula."  A-18 (quoting Plaintiff's proposed warning).  For example, according to neonatologist Dr.

– 21 –

Maxwell, he was well aware when treating RaiLee that formula feeding is "a risk factor for NEC" and is "associated with higher rates" of NEC than human milk:

> Q. "For vulnerable premature infants formula feeding is associated with higher rates of necrotizing enterocolitis." Do you see that?
>
> A. Yes.
>
> Q. And in 2011, when this report came out, were you aware that formula feeding was associated with higher rates of necrotizing enterocolitis?
>
> A. Yes.
>
> Q. And were you aware of it in 2014 when you treated RaiLee Mar?
>
> A. Yes. [Dkt. 596-2 (Maxwell Tr.) 95:7–18 (discussing the Surgeon General's 2011 Call to Action to Support Breastfeeding) (cited at Dkt. 596 ¶ 45).].
>
> ***
>
> Q. And I think you said during plaintiff's counsel's questioning that you knew in 2014 that feeding formula was a risk factor for NEC; was that correct?
>
> A. Yes. I mean, I think feeding anything is a risk factor for NEC. It's one of the risk factors, so yes. The answer is yes. [*Id.* at 218:18–23.]

The AAP guidelines confirm this. As discussed above, the AAP has long touted the NEC-reducing qualities of human milk and has issued guidelines that specifically discuss the higher incidence of NEC in formula-fed infants as compared with infants fed human milk. *See supra* at 6–8. Maxwell is a member of the AAP and confirmed that he "must have read" the 2012 AAP Statement on Breastfeeding and the Use of Human Milk, which contains details and figures showing the advantages of feeding human milk over formula in terms of reducing NEC rates.

Dkt. 596 (Abbott's SOF) ¶ 24; Dkt. 596-2 (Maxwell Tr.) 216:11–218:15; Dkt. 596-9 (2012 AAP Statement). And his colleague Dr. Shah—also one of RaiLee's treaters—likewise confirmed that he has been a member of the AAP for many years and regularly reads literature about the benefits of human milk, including with respect to NEC reduction. Dkt. 596 (Abbott's SOF), ¶ 22; Dkt. 596-10 (Shah Tr.) 19:18–23, 181:17–183:24, 200:9–12.

This uncontroverted evidence defeats Plaintiff's failure-to-warn theory as a matter of law. A manufacturer cannot be held liable for failure to warn when the product's user was already aware of the relevant risks. *Howard v. Eaton Corp.*, 2016 WL 6651592, at *4 (W.Va. 2016) (Mem. Op.) (Supreme Court of West Virginia, affirming summary judgment for defendant on failure-to-warn claim when product user already "knew of the risks and hazards"); *Smallridge v. Johnson & Johnson*, 2022 WL 1417313, at *4 (N.D. W. Va. 2022) (granting summary judgment where the treater "learned of the risks through his residency, textbooks, courses, meetings, and lectures," not the product label) (West Virginia law); *cf. Todd v. Societe BIC, S.A.*, 9 F.3d 1216, 1219 (7th Cir. 1993) (en banc) (affirming summary judgment in failure-to-warn case when the adult-plaintiffs conceded in depositions "that they appreciated the hazard" associated with lighters and had prior experience with a child setting a fire from a cigarette lighter, confirming that a warning would not have made a difference) (Illinois law). This is consistent with the basic rule of law in West Virginia that a manufacturer has no duty to warn of obvious dangers. *See*

W. Va. P.J.I. § 423; *Wilson v. Brown & Williamson Tobacco Corp.*, 968 F. Supp. 296, 301 (S.D. W. Va. 1997) ("no duty to warn of obvious dangers present in products").

In short, with or without a warning from Abbott, the information in the proposed warning was *already known* to RaiLee's medical treaters—the individuals who selected and administered the product and to whom Plaintiff herself admittedly deferred.  The physicians' knowledge makes it impossible for Plaintiff to prove that Dr. Scheer's proposed warning would have led the doctors to change the treatment.  This would be enough by itself to affirm the award of summary judgment—and the Court can resolve the appeal on this basis without assessing *any* of the speculative causation theories that Plaintiff asserts on appeal.

## B.     In any event, there was nothing else to feed RaiLee.

There is also another, independent problem, and it formed the heart of the district court's ruling:  RaiLee's physicians could not have "act[ed] differently" in administering formula (*Tracy*, 524 S.E.2d at 890 n.9) because *nothing else was available to feed her.*  It is undisputed that RaiLee's mother had to stop pumping because she was not producing adequate milk—and the small amount of milk she was able to produce was tainted with blood due to over-pumping.  Dkt. 616 (Pl's Resp. to SOF) ¶ 40 (staff instructed her to "dump" this tainted milk).  It is also undisputed that in 2014, CAMC did not have a donor milk program.  *Id.* ¶ 46.  As the district court correctly concluded, that meant that once the supply of stored maternal milk became insufficiently low, "cow's-milk-based infant formula was the only option to feed her."  A-20.

For this reason too, Plaintiff cannot prove that RaiLee's treaters would have made a different choice if they received different information from Abbott.  In fact, Dr. Maxwell explained that it would have been impossible to choose anything else:

> Q. Would [an updated label] have changed your decision to provide RaiLee Mar a one-to-one mixture of formula and Mother's own milk knowing that the mother's own milk was running out and you did not have donor milk at that time?

> A. Well, what else would we feed this baby?  I mean, we have to have some sort of formula, if we run out of Mom's milk and there was no option for donor's milk. You can't send babies home on donor's milk anyway, so we have no other option.

Dkt. 596-2 (Maxwell Tr.) 91:20–92:5 (cited at Dkt. 596 ¶ 48).

Notwithstanding this clear and dispositive testimony, Plaintiff offers three theories as to how a warning might have affected RaiLee's feeding.  The district court correctly rejected all of them.  A-18–20.

### 1. The record evidence defeats any speculation that CAMC would have been able to fast-track a donor-milk program.

Plaintiff's first theory is that if Abbott had provided a different warning, CAMC would have created a donor milk program more quickly.  Plaintiff's sole support for this hypothesis is language cherry-picked from the following exchange in Dr. Maxwell's deposition transcript:

> Q. If you knew back in 2014 that formula was the primary risk factor or significantly increased the risk of NEC, would you [have] made efforts to get donor milk at that time?

> A: It's not that easy.  It would make sense, wouldn't you think?  But, you know, it took us five years before we could get donor milk.  I mean, it doesn't happen that

> easily. You have to go through the hospital, go
> through the board and the foundation and all of this to
> get funding to get donor milk. It's not something that
> happens over night [sic].
>
> Q. Understood. It's clearly a challenge.
>
> A. But we would have tried, yes, to get donor milk maybe
> quicker than we did. I'm not sure we had that
> opportunity at the time.
>
> Q. Right. And assuming that the – if the premise is that
> formula significantly increases the risk, that is a piece
> of information that presumably you could have used to
> fast-forward those bureaucratic efforts, wouldn't you
> agree?
>
> A. Yes.

Dkt. 596-2 (Maxwell Tr.) 119:16–120:15, quoted (selectively) in Br. 10–11. There

are a host of problems with this theory.

***First***, this entire passage is about a warning *different from the one at issue in*

*this case.* As discussed above, the district court held Plaintiff to the one warning

proposed by Dr. Scheer—that "'human milk has a lower risk of NEC.'" A-18. There

is no evidence that receiving Dr. Scheer's proposed warning would or could have led

Dr. Maxwell to do anything different at all; to the contrary, he already knew that

information. *See supra* Part I.A. Counsel nevertheless asked what Dr. Maxwell

would have done if Abbott had included a label describing formula as "the primary

risk factor" for NEC or as "significantly increas[ing] the risk" of NEC. But neither

concept was ever part of *any* proposed warning in this case. In fact, Plaintiff's own

experts have explained that nothing "outranks prematurity" as "the major" and

"larg[est]" risk factor for NEC. Dkt. 596-4 (Spector Tr.) 40:18–41:14. And referring

to some undefined "significant" risk increase would only be confusing and potentially misleading because, as Plaintiff's own expert also explained, any alleged risk increase requires an assessment of individualized factors like "gestational age," "birthweight," and the "proportion of human milk" in the diet. Dkt. 596-6 (DeZure Tr.) 264:13–17, 265:4–6, 266:2–6. In fact, far from recognizing a "significant" increase in risk, the district court granted summary judgment on the second bellwether because studies "find *no risk* of NEC from formula" when they include "infants weighing 2,000 grams and of 32 weeks gestational age at birth." *Diggs*, 2025 WL 2377686, at *5, *9 (emphasis added). Similarly, Plaintiff's experts could not identify any study showing *any* increased NEC risk for infants, like RaiLee, fed only 5% formula. *See infra* Part III.

**Second,** even if the science supported a "primary risk factor" / "significantly increases the risk of NEC" warning and Abbott included such a warning on its label, there is no evidence that Dr. Maxwell would even have seen it, much less relied on it. As one might expect, Dr. Maxwell testified that he makes feeding decisions using his medical education, training, and expertise and that he only "very rarely" reviews information from the manufacturer. Dkt. 596-2 (Maxwell Tr.) 53:15–54:4, 63:3–8, 86:8–10. This too stands in the way of Plaintiff's theory. *See Smallridge*, 2022 WL 1417313, at *4 (granting summary judgment under West Virginia law where the relevant physician-user "learned of the risks through his residency, textbooks, courses, meetings, and lectures," not the product label); *see also In re Zimmer, NexGen Knee Implant Prods. Liab. Litig.*, 884 F.3d 746, 753–54 (7th Cir.

2018) (Wisconsin law) (affirming summary judgment for lack of warning causation when the treater "did not read the instructions" and instead made "his decision[s] based on his own past experience, not on any marketing materials or information provided by" the manufacturer).

To be sure, it is always possible to "speculate[] about [various] ways an adequate warning might have reached" the treating physician "and altered [his] decision." *Pustejovsky v. PLIVA, Inc.*, 623 F.3d 271, 277 (5th Cir. 2010) (Texas law). But "without any summary-judgment evidence to support them," these scenarios "remain nothing more than possibilities." *Id.* at 277–78 (affirming summary judgment on failure-to-warn claim on causation grounds). Plaintiff suggests otherwise, quoting a lengthy, intellectual "explanation" on warning causation from a Sixth Circuit case, *Payne v. Novartis Pharmaceuticals Corp.*, 767 F.3d 526 (6th Cir. 2014)—with no case-specific discussion at all. *See* Br. 14. It is unclear how this recitation helps. "Causation issues in failure-to-warn cases" may sometimes "present particularly knotty problems" (Br. 14 (citing *Payne*, 767 F.3d at 527)), but that does not give Plaintiff license to reach trial based on pure speculation. The Sixth Circuit confirmed the same in a different failure-to-warn case:

> Yes, it is the jury's prerogative to draw reasonable inferences from the competing evidence presented at trial. But no, juries do not determine whether and when a party presents sufficient evidence to create a triable issue of fact. Trial and appellate courts must decide whether the inferences a party asks the jury to draw are too speculative to be reasonable.

*Rodriguez v. Stryker Corp.*, 680 F.3d 568, 573 (6th Cir. 2012). That case, in fact, looks a lot like this one: the plaintiff had "no evidence that, even if [the manufacturer] had placed the proposed warning in the instructions or given it through a sales representative, the warning would have reached [the doctor] or would have prevented the injury." *Id.* at 576 (affirming summary judgment).

Equally unpersuasive is Plaintiff's citation to the First Circuit's decision in *Knowlton v. Deseret Medical, Inc.*, 930 F.2d 116 (1st Cir. 1991) (cited in Br. 15). Plaintiff cites that case for the proposition that it is "not only reasonable but compelling" to infer "that physicians and parents would not 'deliberately ignore[]' a warning about a life-threatening risk." *Id.* (alteration in original). But that's not the holding of *Knowlton*, which is distinguishable in any event. The *Knowlton* plaintiff presented evidence that a "reasonably prudent heart surgeon would not have appreciated the danger inherent in" a specific medical technique involving catheters—and that ignoring a "direct warning" about that danger would "amount to malpractice" by the surgeon, leading to the inference that "if a warning is given, it will be followed." *Id.* at 122–23. The same is obviously not true here: even Plaintiff's own experts—who are presumably aware of Plaintiff's theory of risk— continue to rely on formula in treating their own patients in the NICU. Dkt. 596 (Abbott's SOF) ¶¶ 18–19 (citing testimony from three of Plaintiff's experts). Plaintiff is in no position to call this "malpractice." And in any event, West Virginia—unlike Massachusetts, whose law governed *Knowlton*—does not recognize the "heeding presumption," which (in other states) presumes the "plaintiff would

– 29 –

have read and heeded an adequate warning if it had been given." *Muzichuck v. Forest Lab'ys, Inc.*, 2015 WL 235226, at \*12 (N.D.W. Va.) (discussing same); *see* W. Va. P.J.I. § 415 ("[Plaintiff] must establish that the warning suggested by [her] would have caused [her] to act differently or otherwise change [her] behavior in a manner that would have avoided the injuries."). For this reason too, *Knowlton* has no application here.

**Third**, *there is no evidence that any of this would have helped RaiLee.* Dr. Maxwell was not the sole decisionmaker on donor milk at CAMC; as he explained, "You have to go through the hospital, go through the board and the foundation and all of this to get funding to get donor milk. It's not something that happens over night [sic]." Dkt. 596-2 (Maxwell Tr.) 119:16–120:3. And as the district court observed:

> Plaintiff has entered no testimony from CAMC
> administrators or policymakers supporting her assertion
> that the warning for which she advocates would have
> resulted in a different world where donor milk or Prolacta
> [a human-milk-based product] were available for RaiLee.

A20. As a result, the most Dr. Maxwell's testimony suggests is that if he had received a "primary risk factor"/"significantly increases" warning from Abbott in 2014, he "could" have "used" that information in an attempt to get CAMC to create a donor milk program "quicker." But would that effort have succeeded? And if so, how much "quicker"? Surely not so "quick[]" that donor milk would have been available for RaiLee on January 14 of that same year. The reality is that it took *years* to get donor milk at CAMC—until at least two years after Railee's birth. Dkt.

596-10 (Shah Tr.) 174:22–175:11.  Contrary to Plaintiff's suggestion, there is *no*
evidence to support her theory on any of these points—much less "sworn testimony
and undisputed circumstantial evidence," as she suggests.  Br. 13.  And all the
evidence that *does* exist in the record is directly contrary to Plaintiff's theory.

Indeed, while Dr. Maxwell testified that "we would have tried, yes, to get
donor milk maybe quicker than we did" (quoted in Br. 10), his next words—ignored
by Plaintiff, both below and on appeal—were "I'm not sure we had that opportunity
at the time."  Dkt. 596-2 (Maxwell Tr.) 120:6–8.  That testimony alone distinguishes
this case from this Court's decision in *Cloutier v. GoJet Airlines, LLC*, 996 F.3d 426
(7th Cir. 2021), featured in Plaintiff's brief.  *See* Br. 11–14.  In *Cloutier*, an FMLA
plaintiff missed the statutory deadline for receiving his return-to-work clearance by
just one day, after the defendant-employer failed to give him the required
regulatory notices and "ignor[ed] [his] repeated and consistent efforts to
communicate" about his leave.  *Cloutier*, 996 F.3d at 440–41.  The plaintiff testified
that, had the required notices been given, he would have "have pressed the doctor to
have the test done quicker" and would thus have been done with the paperwork at
least a day earlier.  *Id.* at 441.  This Court affirmed the denial of summary
judgment, finding that a reasonable jury could have credited the plaintiff's
assertions "[u]nder the circumstances," as the defendant "d[id] not point to any
evidence of its own undermining [the plaintiff's] testimony."  *Id.* at 442.

The circumstances here are far different.  For one, the witness whose
testimony Plaintiff is relying on was *himself* unsure whether anything more could

be done at the relevant point in time.  Dkt. 596-2 (Maxwell Tr.) 120:6–8 ("I'm not sure we had that opportunity at the time.").  Plaintiff ignores this testimony here, just like she did below, which led the district court to observe that Plaintiff "overstate[d] the strength of Dr. Maxwell's testimony."  Br. 16; *see also* A-19.  Contrary to Plaintiff's assertion, the court's observation was not a "reject[ion]" of Dr. Maxwell's testimony—nor was it a "credibility determination[]," an impermissible "weighing" of evidence, or anything else improper.  *Contra* Br. 16.  It was simply an observation that Plaintiff was selectively quoting Dr. Maxwell's testimony and had thus taken it out of context.  *See* A-20 (emphasizing the sentence Plaintiff had deleted: "*I'm not sure we had that opportunity at the time*.").[3]  When read in full, Dr. Maxwell's testimony *defeats* any inference that a donor milk program could have been established in a matter of days, as Plaintiff's theory requires.

Other evidence does too.  Abbott's expert neonatologist, Dr. Martin, explained that even though her hospital "would talk about it frequently," donor-milk-program implementation takes time: "you look at the data and you look across the board of all the literature" to develop evidence-based feeding protocols incorporating donor milk, which is a "wholesale practice change, given everything else that it entailed." *Mar* Dkt. 52-5 (Martin Tr. Vol. 2) 134:17–135:12.  Contemporaneous documents, too, showed the difficulty of the task.  *See, e.g.*, Dkt. 596-13 (NICU Currents 2013) at 8 ("Considerations in the care of human milk include the containers used, labeling

---

[3]  In any event, this selective quotation was not the lynchpin of the district court's decision; the absence of relevant testimony "from CAMC administrators or policymakers" was.  *See supra* at 30; A-20.

techniques and transportation, as well as storage, thawing and warming methods. Protocols are required to prevent the misadministration of human milk"). And RaiLee's other treater, Dr. Shah, echoed Dr. Maxwell on this broader marketplace issue: "Now [2024] it is our practice to give donor milk. Back in 2014, it was not available." Dkt. 596-10 (Shah Tr. 37:6–9); *id.* at 175:5–11 ("I remember the plans to get donor milk for some time"). All of this constitutes evidence "undermining" Plaintiff's imagined world where donor milk is available and administered at the snap of a finger—and is the very type of contrary evidence that was missing in *Cloutier*. 996 F.3d at 442.

In the end, Plaintiff's proof is insufficient at each step. She "is not entitled to the string of inferences [she] requests" (*Waukegan Potawatomi Casino, LLC v. City of Waukegan*, 128 F.4th 871, 878 (7th Cir. 2025)) because none (much less all) of those inferences are "reasonably grounded in the record." *Contra* Br. 12. She cannot obtain reversal on this basis.

### 2. There is no evidentiary basis to infer that if Abbott's label had been different, treaters at CAMC would have administered unpasteurized, untested breastmilk.

Plaintiff's second hypothesis fares no better. According to Plaintiff, "a jury could fairly infer that if the NICU's doctors had known of the serious risk posed by formula, their risk-benefit analysis would have been different," leading them to "accept[] the offered breastmilk"—that is, unpasteurized, untested breastmilk from a personal acquaintance of Plaintiff. Br. 11, 13.

No such inference is possible. Plaintiff concedes (as she must) that "the hospital *rejected* that [feeding] alternative" (Br. 11, emphasis added)—and for good

reason: the hospital did not want to "assum[e] the risk of the donor mother potentially transmitting disease." Dkt. 596-39 (Sheridan Tr.) 58:11–19. Dr. Maxwell explained this: "You know, we don't know the medical history of the person that's providing the milk. For all that we know she might have hepatitis or HIV or something else." Dkt. 596-2 (Maxwell Tr.) 71:14–72:5 ("We didn't practice that in our unit"). This is consistent with authoritative guidance, then and now, that sharing unpasteurized milk "is not recommended" for vulnerable infants due to "safety" concerns. *E.g.*, Dkt. 605-5 (2017 AAP Statement) at 1; Dkt. 596-9 (2012 AAP Statement) at 831 (quality control concerns).

Here again, the district court did not "reject[]" or "dismiss[]" Plaintiff's testimony about the availability of this milk. *Contra* Br. 16–17. On the contrary, the court acknowledged that testimony, credited it, and reasoned:

> *Assuming [this offer] was made, however,* there is no evidence to suggest that an adequate warning would have resulted in RaiLee's being fed the friend's unpasteurized milk. As described above, the rejection of the friend's milk does not appear to be based on the treating nurse's judgment on the relative risk of formula and donor milk, but instead on the hospital's official policy on rejecting informal milk donations given the unrelated risks of unpasteurized milk.

A-18 (emphasis added). And this is exactly right. There is no evidence in this record to suggest that *any* credible medical professional would find it better to give unpasteurized, untested breastmilk to an extremely premature infant in the NICU than it would be to administer (quality-controlled) preterm infant formula—or that RaiLee's treaters would have done so, had Abbott told them what they already

knew. *Contra* Br. 11 (claiming—without support—that "a jury could fairly infer" this). Plaintiff cannot obtain reversal on this basis either.

> **3.    There is no evidentiary basis to infer that Plaintiff herself would even have seen a manufacturer warning in the NICU, much less acted on it in a manner that would have avoided the need for formula.**

Plaintiff's final hypothesis rests on "parental testimony about what they would have done had they been warned." Br. 13; *see* Br. 17–18 (same effect). According to Plaintiff, armed with a warning, she would have either "us[ed] her own expressed milk" over the medical team's objection (as her milk was tainted with blood due to over-pumping); "insisted on donor milk" (from some unidentified place); or else brought her friend's milk into the hospital and falsely represented it to be "her own—bypassing the need to get hospital approval." Br. 11, 13.

All these far-fetched arguments fail for a simple reason: Plaintiff concedes she never read anything from Abbott in the first place, so there is no evidentiary basis to infer that she would have seen a warning at all.

When there is "no evidence" "that [a plaintiff] would have heeded or read additional warnings," summary judgment is unavoidable. *Howard*, 2016 WL 6651592, at \*4; *see also* W. Va. P.J.I. § 415 (same effect). That is exactly the case here, by Plaintiff's own admission. As the district court observed, Plaintiff testified that "she *did not review* the packaging on SSC24 or any warnings and 'relied on RaiLee's NICU team' to make the best choice for feeding RaiLee." A-19 (citing support, including Dkt. 596-41 (Mar Tr.) 88:14–22 (emphasis added). Of course, that is exactly what Abbott's label (had she seen it) would have warned her to do—

to consult her infant's physicians.  Dkt. 596-43 (Similac Special Care product label) ("USE AS DIRECTED BY A DOCTOR").

This is dispositive of Plaintiff's claims as a matter of law.  Because Plaintiff never saw the product label in the first place, a defective warning could not have been "the proximate cause of [the claimed] injuries."  *Howard*, 2016 WL 6651592, at *4 (affirming summary judgment on failure-to-warn claim, where the plaintiff "admit[ted] that he failed to read the warnings and manuals that were in place at the time of the accident"); *see also Meade*, 2010 WL 4909435, at *10 (same effect); *Shanklin v. Allis-Chalmers Mfg. Co.*, 383 F.2d 819, 823–24 (4th Cir. 1967) (failure to warn could not have proximately caused plaintiff's injuries when it was "not disputed that [plaintiff] in any event never looked at the manual in his possession") (West Virginia law).  For this reason alone, Plaintiff's "would have" testimony—like her appeal to "ordinary common sense" (Br. 17)—does not raise a triable issue on warning causation.  Affirmance is required.

## II. The district court did not abuse its discretion in denying reconsideration.

The district court also properly denied Plaintiff's reconsideration motion. This Court reviews that denial for an abuse of discretion.  *Cincinnati Life Ins. Co. v. Beyrer*, 722 F.3d 939, 955 (7th Cir. 2013).  There was no abuse here—not even close.

As this Court has held, "[a] Rule 59(e) motion will be successful only where the movant clearly establishes: '(1) that the court committed a manifest error of law or fact, or (2) that newly discovered evidence precluded entry of judgment."  *Id.* at 954; *accord, e.g.*, *Edgewood Manor Apt. Homes, LLC v. RSUI Indem. Co.*, 733 F.3d

761, 770 (7th Cir. 2013); *Oto v. Metro. Life Ins. Co.*, 224 F.3d 601, 606 (7th Cir. 2000). And when that motion is based on "newly discovered evidence," as here, the movant must clearly establish "not only that this evidence was newly discovered or unknown to it until after the hearing, but also that it could not with reasonable diligence have discovered and produced such evidence during the pendency of the motion." *Caisse Nationale de Credit Agricole v. CBI Indus., Inc.*, 90 F.3d 1264, 1269 (7th Cir. 1996) (cleaned up).

Applying these precedents, the district court found that Plaintiff's reconsideration motion "provide[d] no basis to disturb the court's prior judgment." A-23. It held, first, that the proffered testimony from the two "new" witnesses—Anthony Mar and Dr. Bar-Yam—could not "be fairly understood as 'newly discovered' under Rule 59(e)," and second, that the new evidence would not "alter the result" on warning causation at any rate. A-25–26. Plaintiff cannot show an abuse of discretion in either ruling—much less *both*, as would be required for relief on appeal.

## A. The purportedly "new" evidence could have been adduced earlier, which precludes reconsideration.

On appeal, Plaintiff oddly claims that the district court erred in analyzing whether her evidence was "newly discovered," because (according to Plaintiff) the "language" of Rule 59(e) "references the 'availability' of the evidence; not the 'discovery' of potentially useful information." Br. 18–19, 23–24 (accusing the district court of "wrongly equat[ing] Plaintiff's counsel's knowledge of potential evidence with 'availability' of evidence").

This is a make-weight argument. Neither the word "availability" *nor* the words "newly discovered" appear in the rule itself. The standards for a Rule 59(e) motion do not come from the text of the rule; they come from the *courts*, including this one. *See, e.g.*, *Caisse Nationale de Credit Agricole*, 90 F.3d at 1269 (discussing what constitutes newly discovered evidence). While one district court used the phrase "not available" (rather than "newly discovered") in its discussion of Rule 59(e) (*Emerick v. Wood River-Hartford Sch. Dist. No. 15*, 2018 WL 11508497 (S.D. Ill.), cited in Br. 18), that word choice did not purport to—and cannot—change Seventh Circuit precedent on this issue. Indeed, *Emerick* itself quotes a Seventh Circuit opinion that contains the "newly discovered" language. *See id.* at *1 (quoting *Publishers Resources, Inc. v. Walker-Davis Publ'ns, Inc.*, 762 F.2d 557, 561 (7th Cir. 1985)). Plaintiff's textual argument has no merit at all.

Nor does her substantive argument, the thrust of which is that "neither witness was under Plaintiff's control, and neither witness was a party," so she had no obligation to explore their testimony earlier. Br. 18; *see also* Br. 19–20, 23–24 (raising same "control" argument). Not surprisingly, Plaintiff cites no authority to support this position. Third parties give sworn affidavit testimony all the time, whether by subpoena, court order, or their own willingness and volition. Thus it is simply false for Plaintiff to say she "could not reasonably have presented sworn testimony before [the] depositions [noticed by Abbott] occurred." Br. 23. The district court said the same: "Plaintiff had no need to rely on her opponent's discovery efforts, as she herself had access to this witness and could have submitted

Dr. Bar-Yam's evidence, now deemed 'critical' (Pl.'s Mot. at 1), by way of a declaration or affidavit.  The same is true of Anthony Mar's testimony."  A-25. Plaintiff had no answer on this diligence issue in the district court, and she has no answer here, either.

Putting this all together: Plaintiff has known for *years* that her case included a failure-to-warn claim, and she could have identified these witnesses and sought affidavits or depositions at any point during discovery.  This testimony "could have been adduced earlier." *Caisse Nationale*, 90 F.3d at 1269–70.  Indeed, even after Abbott moved for summary judgment—including an extensive argument on warning causation (*Mar* Dkt. 49 (Abbott MSJ Br.) at 27–30)—Plaintiff had *months* before the hearing to secure testimony from these witnesses.  But rather than do so, she listed them as trial witnesses (independent of summary judgment briefing) and waited for Abbott to depose them.  None of this amounts to "reasonable diligence" by Plaintiff.  *See, e.g.*, *Oto*, 224 F.3d at 606 (affirming denial of reconsideration in the absence of a "reasonable diligence" showing, even where the movant claimed that he "discovered this witness only by 'sheer coincidence'"); *Moro v. Shell Oil Co.*, 91 F.3d 872, 876 (7th Cir. 1996) (rejecting attempt to introduce belated affidavit from employees; Rule 59(e) "does not provide a vehicle for a party to undo its own procedural failures").  Far from abusing its discretion (*Cincinnati Life*, 722 F.3d at 956), the district court was spot on in its analysis.  Plaintiff's attempt was simply "too little, too late."  *Moro*, 91 F.3d at 876.

**B.    The "new" testimony was immaterial at any rate.**

Independently, Plaintiff did not "clearly establish" that her belated evidence would have "precluded entry of judgment," even if credited. *Cincinnati Life*, 722 F.3d at 954–55. The district court was right on this, too—and at a minimum, it did not abuse its discretion in so finding.

Take Anthony Mar's testimony. Yes, he said he recalled seeing a formula bottle in the NICU. Br. 21 (arguing same). But Plaintiff ignores the rest of Mr. Mar's testimony, which made perfectly clear that he did not see or review any product labels or packaging:

> Q. Ms. Mar testified she never saw any of the packaging or labels for the formula that RaiLee was administered, and I assume you didn't either. Is that right?
>
> A. I did not. No.
>
> Q. Okay. Sorry. I'll re-ask the question. Did you see any of the packaging or labeling for the formula that RaiLee was administered?
>
> A. No specific labels or packaging, no.
>
> * * *
>
> Q. Did you ask to read [the bottle] or anything like that?
>
> A. No.
>
> Q. Did you pick it up?
>
> A. No.
>
> Q. Okay. Did anyone make it available to you for reading?
>
> A. No.

Q. Were you curious about it at all when you saw it?

A. At the time, I was trusting the doctors, yes.

\* \* \*

Q. I mean, they had to feed RaiLee something.  Would you
   agree with that?

A. Yes.

Q. Okay.  And is it fair to say you relied on the NICU
   team to determine what was the best nutrition
   available after the breast milk ran dry?

A. Yes.

\* \* \*

Q. And is it fair to say that you relied on [the medical
   staff's] education and experience in treating RaiLee to
   the best of their abilities?

A. Yes.

*Mar* Dkt. 98-1 (A. Mar Tr.) 56:12–15, 60:3–9, 62:17–63:2, 94:16–95:1.  Given this, it

is highly misleading for Plaintiff to assert (without citation) that "RaiLee's dad did

see the Similac Special Care packaging in the NICU."  *Contra* Br. 12.

Mr. Mar's admissions are "critical," as the district court found.  A-26.  The

court explained why: "Anthony Mar, like Plaintiff herself, admits that he never saw

the packaging on the products used to feed RaiLee.  Mr. Mar surely would not have

exposed his child to an unnecessary risk, but unless he observed the labeling and

packaging of the product in question, his testimony does not support the argument

that a different warning would have led to a different outcome for RaiLee."  A-27; *cf.*

*Knight v. Boehringer Ingelheim Pharms., Inc.*, 323 F. Supp. 3d 809, 831 (S.D.W. Va.

2018) (denying summary judgment because a triable issue remained as to whether

– 41 –

decedent read product label; she "kept medication labels" and "was known to have read drug labels" in the past, so it was possible that "a different warning would have made a difference") (applying West Virginia law).

This reasoning is consistent with—and indeed compelled by—West Virginia law on warning causation. *See supra* at 35–36 (citing cases); *see also, e.g.*, *Johnson v. Niagara Mach. & Tool Works*, 666 F.2d 1223, 1225 (8th Cir. 1981) (an inadequate-warning claim "necessarily presupposes that the operator has read the warning"). It was not error, much less an abuse of discretion.

At any rate, it is not a "fair inference" to think that Anthony Mar—who was not a hospital administrator, physician, or policymaker—could have found human milk through "a donor system somehow" or else have found "a different way to feed [his] daughter"—even if he *had* read the product packaging and ignored (rather than deferred to) RaiLee's doctors. *Contra* Br. 22–23 (citing Mr. Mar's testimony). None of these musings—including about what a "different hospital" would have done (*see id.*)—constitute "evidence based on personal knowledge setting forth specific facts showing a genuine issue for trial." *Waukegan*, 128 F.4th at 879. Rather, they speak to "nothing more than possibilities." *Pustejovsky*, 623 F.3d at 277; *Rodriguez*, 680 F.3d at 573 (cases "containing only a spark or glimmer of evidence that requires the finder-of-fact to make a leap of faith to find the defendant liable" are not submissible). The court did not abuse its discretion on this issue.

Nor did the court abuse its discretion when considering the lack of impact from the testimony of Dr. Bar-Yam, the former director of a milk bank based in

Boston.  According to Plaintiff, Dr. Bar-Yam testified that donor milk "could have been delivered overnight to CAMC (before the remainder of Ms. Mar's expressed breastmilk that was in storage at CAMC had been fed to her daughter)."  Br. 19–20, 23.  That testimony, Plaintiff asserts, created a triable issue on warning causation.

Not so.  Here again, the district court (rightly) pointed out the logical gaps in Plaintiff's inference chain:

> The question for Plaintiff's case has never been whether donor milk banks exist or whether it was technically possible to ship donor milk from Boston to West Virginia, but whether donor milk was an option *at CAMC* at the time of RaiLee's birth.  Dr. Bar-Yam admitted in her deposition that she had no contact with CAMC, with RaiLee's treating physicians, or with RaiLee's parents in 2014.  (Bar-Yam Tr. at 17:18–22:4.).  The theory, suggested for the first time on reconsideration, that an adequate warning would have resulted in Plaintiff or the physicians at CAMC getting in touch with Dr. Bar-Yam's New England-based donor milk bank is plainly speculative and unsupported by Dr. Maxwell's and Plaintiff's own prior testimony [about donor milk availability].

A-26.  The abuse-of-discretion standard of review is insurmountable here.  In no world is the district court's conclusion so irrational that "no other reasonable person would reach" it.  *Cincinnati Life*, 722 F.3d at 956.

Quite the opposite: *no* evidence supports the inference that Dr. Maxwell would have suddenly called a milk bank in Boston out of the blue for a one-off shipment.  Indeed, Dr. Bar-Yam testified that it is "rare" to send a shipment to a hospital without an established donor milk program, and she did not recall *ever* shipping to a hospital in West Virginia.  *See supra* at 15.  And even if Dr. Maxwell

– 43 –

or someone else had, indeed, placed that unlikely call to Boston, there is no evidence to support the inference that such a shipment would have made a difference for RaiLee—and plenty of evidence to defeat it. The first notation in the medical records that the hospital was "running out" of mother's milk was at 1:04 p.m. on January 14, 2014, less than 8 hours before RaiLee was first fed formula. Dkt. 596-6 (DeZure Tr.) 251:5–9; Dkt. 596-2 (Maxwell Tr.) 184:21–186:19. It would thus have been all but impossible for a shipment to arrive in time to avoid the need for formula. And even if the "overnight" shipment had somehow arrived before any formula was given, Plaintiff cites no evidence showing that RaiLee's NEC had not already started before Plaintiff's milk ran out. Dkt. 596-6 (DeZure Tr.) 251:10–18. To the contrary, Plaintiff's own expert admitted that NEC can progress for "days to weeks" before erupting into a diagnosable disease, and thus RaiLee's NEC likely had been incubating in her body even "before formula" was given. *Id.* at 281:2–19, 379:22–25.

Finally, a jury also could not rely on Dr. Bar-Yam's testimony as proof about what a different, geographically closer milk bank could or would have done in January 2014. *See* A-24 n.1 (noting same). Dr. Bar-Yam testified that she never worked "for any other milk bank" besides the one in Boston (*Mar* Dkt. 98-2 (Bar-Yam Tr.) at 13:4–8), and she specifically testified that she had "no personal knowledge" about "the availability [of] donor milk . . . closer to the state of West Virginia" (*id.* at 30:18–22). She also had "no idea" whether other milk banks had a

relationship with CAMC in 2014.  *Id*. at 136:5–14.  Her testimony doesn't support Plaintiff's speculation; it defeats it.

From every angle, "the inferential leap from the evidence to the conclusion is too great," and thus this matter was properly "removed from the province of the jury."  Restat. 3d of Torts: Liability for Physical and Emotional Harm, § 28 cmt. b (cited in *Payne*, 767 F.3d at 527 (cited Br. 14)).  For all the reasons discussed above, the district court did not abuse its discretion in denying reconsideration.

## III.  This Court can also affirm on an independent basis:  the evidence did not support a reasonable inference on medical causation.

There is another, equally important and independent avenue for affirmance here—Plaintiff's failure to produce evidence sufficient to find that Abbott's formula was a "but for" cause of NEC in this case.  *Mays*, 579 S.E.2d at 563 ("The proximate cause of an injury is the last negligent act contributing to the injury and without which the injury would not have occurred.").

The causation theory in these cases has always focused on a well-known *association* between formula feeding and NEC in certain preterm infants.  But that association is fully explained by the protection offered by human milk, not by any toxicity in formula.  And, in all events, "an association is not the same as causation."  *Harris v. CSX Transp., Inc.,* 232 W. Va. 617, 624 (2013) ("An epidemiological association identified in a study may or may not be causal.").  But even setting that aside, for infants like RaiLee—with a predominantly human-milk diet—*there isn't even an association*.  This much is undisputed—and it is dispositive on medical causation.

There is no dispute that RaiLee Mar received 72 feedings of 100% mother's milk and then just three feedings of 50/50 human milk and formula before she developed NEC; thus, all 75 feedings included her mother's own milk to help protect against NEC.  *See* Dkt. 616 (Pl's Resp. to SOF) ¶¶ 39, 41.  And taking all those feedings into account, no one disputes (nor could they, as a matter of math) that her diet before NEC was 95% her mother's own milk—the very thing that neonatologists agree provides the greatest possible protection against NEC.  Dkt. 596-8 (Martin Rep.) at 39.

None of Plaintiff's experts offers any basis to conclude that there is even an *association* with NEC under those circumstances.  Dr. Spector, one of Plaintiff's general causation experts, concedes that he did not "do[] an analysis specifically" of infants who received comparable proportions of human milk, and he therefore cannot say whether formula is associated with any increase in the risk of NEC in infants fed more than 90% human milk.  Dkt. 596-4 (Spector Tr.) 360:5–11; Dkt. 596 (Abbott's SOF) ¶ 58.  In fact, Dr. Spector is "not aware" of *any* study showing an increased risk at that 90% threshold.  *See* Dkt. 596-4 (Spector Tr.) 349:18–350:14.  Quite the opposite: he admits "there was no significant association" shown in the literature "with NEC among preterm infants exposed only to limited amounts of BBNPs [bovine-based nutrition products] via fortifier added to human milk[.]"  Dkt. 596-49 (Spector Suppl. Rep.) at 16; Dkt. 596 (Abbott's SOF) ¶ 60.  And Plaintiff's other general causation expert, Dr. Sucre, concedes that she did not do that dose-specific analysis either; she focused only on animal and in vitro models, not

epidemiology, and she conducted no analysis on what dose of formula might be associated with NEC.  *See* Dkt. 596-3 (Sucre Tr.) 120:8–12, 344:2–8, 345:3–6; Dkt. 596 (Abbott's SOF) ¶ 54.  Neither did Dr. DeZure, Plaintiff's specific causation expert: she too could not identify any studies finding a higher risk of NEC in a diet like RaiLee's.  Dkt. 596-6 (DeZure Tr.) 238:22–25; Dkt. 596 (Abbott's SOF) ¶ 56.

Faced with this uncontroverted evidence, Plaintiff attempted to evade summary judgment by introducing an attorney-concocted dispute about how to measure the ratio of human milk to formula:  Should it be based on the percentage of formula after formula was introduced, as Plaintiff argued, or should it be based on the percentage of formula in the infant's entire feeding course before NEC, as Abbott contends, consistent with all the experts and all the scientific studies?  *See, e.g.*, Dkt. 596-6 (DeZure Tr.) 259:1–3 (Plaintiff's specific-causation expert: "Q. Okay. She got approximately 95 percent mom's own milk, right?  A. Yeah, she did.").  With no support in the record, Plaintiff's counsel argued that this was a "50% formula diet, not 5%," because "the three mixed feedings RaiLee received immediately prior to developing NEC were all 50% formula[.]"  A-6 (summary judgment order, explaining same).  The district court declined to wade into the "measurement" issue at that time, having concluded that Abbott was entitled to summary judgment on other grounds.  *See id.*

But the district court returned to this "measurement" issue in another MDL decision a few months later—in another bellwether case that involved the very same general-causation expert, expert report, and deposition testimony.  There, the

court agreed with Abbott (and with the experts and science generally) that "the methods of measurement described in the studies appear more consistent with Abbott's description than with the one for [sic] proposed by Plaintiffs' attorneys: that is, the studies Dr. Spector [MDL plaintiffs' epidemiology expert] considered measured diet over the course of *all* feeds, rather than from the first feed of [cow's-milk-based formula]." *Brown*, 2025 WL 2987083, at *7 (emphasis added). This makes sense, given the enduring protection offered by human milk. *E.g.*, Dkt. 596-9 (2012 AAP Statement) at e828, e831, e835. And, even more critically, the district court observed that "[n]one of Plaintiffs' experts have offered an opinion on whether a diet of just 10% CMBF (as defined by Defendants and the cited studies) can cause NEC." *Id.* at *8. (The court did not ultimately rule on the causation and expert-exclusion issue in *Brown*, because Abbott had again "shown it [was] entitled to summary judgment for other reasons." *Id.* at *8. The *Brown* plaintiff did not appeal.)

The court's later analysis of this "measurement" issue was exactly right—as was its observation about the lack of expert evidence showing *even an association* between formula feeding and NEC at that 90% ratio—a reality that requires summary judgment in Abbott's favor in this appeal.

To be clear, the expert evidence on general causation was the same between cases. In every one of the bellwether cases so far, the plaintiffs' epidemiology expert, Dr. Spector, divided premature infants into two categories: those who received "*predominantly*" human milk (defined as greater than 50%) and those who

– 48 –

received "*predominantly*" bovine-based nutritional products.  Dkt. 605-8 (Spector Rep. at 9) (emphases added).  He then opined that "premature infants who ingest a predominantly [cow's-milk-based] diet have a 60% higher risk of NEC than premature infants who ingest a predominantly [human-milk] diet."  *Id.* at 15; *accord id.* at 16, 19 (same comparison).  But that says *nothing* about the risk of NEC for infants like RaiLee, whose percentage of formula was only 5%.

A plaintiff in a complex case cannot "seek[] to have the jury 'fill in the gaps' in her evidence and her expert's testimony."  *Dellinger v. Pediatrix Med. Grp., P.C.*, 750 S.E.2d 668, 675 (2013) (affirming summary judgment in the absence of medical causation testimony).  And Plaintiff's specific-causation expert in this case, Dr. DeZure, cannot bridge the gap either.  She relied on Dr. Spector for general causation.  Dkt. 596-6 (DeZure Tr.) 91:3–12 ("I think the general causation experts in this case can comment on [what causes NEC in a population of patients.]").  And she, like Dr. Spector, could not identify *any* study showing an increased NEC risk for infants fed only 5% or 10% formula.  *Id.* at 238:17–25 (5%), 259:17–22 (10%).  This 5% exposure, in other words, is "a level of exposure that *no expert* has opined is toxic."  A-6 (summary judgment order noting same) (emphasis added)).  And without epidemiological studies or general causation testimony, Dr. DeZure had no basis on which to "rule in" formula as a "but for" cause of RaiLee's NEC.  After all, general causation precedes—and is a necessary antecedent of—specific causation.  *See, e.g.*, *C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 831 (7th Cir. 2015) ("General causation examines whether the substance . . . had *the capacity* to cause

the harm alleged.  Specific causation, by contrast, examines whether the substance did, *in fact,* cause the harm alleged.") (cleaned up).

All this to say: no reasonable jury "could conclude, more likely than not, that Abbott's formula could and did cause [RaiLee's] NEC."  *Brown*, 2025 WL 2987083, at *8.  This Court can and should affirm the summary judgment grant on this basis.

## IV.   Any appeal with respect to the design-defect claims is forfeited.

As for Plaintiff's design-defect claims, they are gone and cannot be revived. The district court granted summary judgment on design defect for completely independent reasons (A-7–14), and Plaintiff's brief does not offer any argument on those issues.  Indeed, her "Statement of Issues" on appeal presents only one issue: "Whether the district court erred in granting summary judgment on Plaintiff's failure-to-warn claim . . . ."  Br. 2.  It does not mention design defect.

Nevertheless, at the very end of her brief, Plaintiff makes an odd, passing request to "remand with instructions to reinstate the failure-to-warn ***and design-defect*** claims for trial."  *See* Br. 25, 26 (emphasis added).  That is not sufficient to appeal the ruling on design defect.  "[W]hen the district court decides a case on a particular ground, that subject must be addressed in the appellant's opening brief, if appellant wants it reviewed."  *Dotson v. Faulkner*, 138 F.4th 1029, 1031 (7th Cir. 2025).  "A party also generally forfeits issues and arguments it fails to raise in its initial appellate brief," including—as here—"[i]nsufficiently developed issues and arguments."  *Scheidler v. Indiana*, 914 F.3d 535, 540 (7th Cir. 2019).

In short, any argument as to design defect has been forfeited.  The summary judgment ruling on those claims should stand no matter what else happens.

## CONCLUSION

For all these reasons, the Court should affirm the district court's orders granting Abbott's motion for summary judgment and denying Plaintiff's motion for reconsideration.

January 20, 2026

Respectfully submitted,

*s/ Linda T. Coberly*

Linda T. Coberly
Stephen V. D'Amore
Kelly Mannion Ellis
WINSTON & STRAWN LLP
300 N. LaSalle Dr.
Chicago, Illinois 60654
(312) 558-5600

James F. Hurst
Rebecca Fitzpatrick
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL 60654
(312) 862-2000

*Counsel for Defendant-Appellee*
*Abbott Laboratories*

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Defendant-Appellee Abbott Laboratories, furnishes the following in compliance with Federal Rule of Appellate Procedure 32 and Seventh Circuit Rule 32:

I hereby certify that this brief conforms to the rules contained in Seventh Circuit Rule 32 for a brief produced with a proportionally spaced font. The length of this brief is 13,749 words.

Dated: January 20, 2026

s/ Linda T. Coberly

Linda T. Coberly
WINSTON & STRAWN LLP
300 N. LaSalle Dr.
Chicago, Illinois 60654
(312) 558-5600

*Counsel of Record for*
*Defendant-Appellee Abbott*
*Laboratories*